UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KEENAN G. WILKINS,

Plaintiff,

v.

JEFF MACOMBER,

Defendant.

Case No. 16-cv-00221-SI

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 115

Before the Court is petitioner Keenan Wilkin's Second Amended Petition filed pursuant to 28 U.S.C § 2254(d). The petition raises nine claims. Based on a careful review of the trial court record with proper deference accorded to the state court decisions, the Court concludes that none of petitioner's nine claims entitle him to relief under Section 2254(d)(1). The petition for writ of habeas corpus is thus **DENIED**.

## BACKGROUND

In 2012, a jury in Alameda Superior Court convicted Keenan Wilkins of seven counts of second-degree robbery, seven counts of false imprisonment by violence, and one count of making criminal threats. Dkt. No. 141-23 at 5. The trial court imposed a sentence of 100 years to life in prison on December 26, 2012. *Id*. at 2-3.

Through appointed counsel, Wilkins filed a direct appeal of his conviction. The California Court of Appeal affirmed the conviction on April 28, 2015. Dkt. No. 141-81 at 2. The California Supreme Court subsequently denied a petition for review, along with numerous other petitions. Wilkins filed the present writ of habeas corpus *pro se* before this Court in January 2016. Dkt. No. 1.

United States District Court
Northern District of California

Counsel was appointed in February 2017, and through appointed counsel, Wilkins filed an Amended Petition raising twenty-three claims for relief.  Dkt. No. 43, 45.[1]  In May 2018, this Court granted respondent's motion to dismiss, finding that only a portion of Claim 12 in the Amended Petition was exhausted; the other twenty-two claims were not.  Dkt. No. 58.  In a subsequent Order Granting a Motion for Reconsideration in January 2019, the Court held Claims 18 and 21, and portions of Claims 12, 14, and 22 were exhausted.  Dkt. No. 79 at 24.

New counsel was then appointed in February 2019.  Through newly appointed counsel, Wilkins again moved for reconsideration of the Court's exhaustion order and moved to file a Second Amended Petition.  The Court ultimately held that Claims 2, 8, 18, 21-23, and portions of Claims 7, 12, and 14 were exhausted.   Dkt. Nos. 130, 134.  The Court now proceeds to the merits of those claims.

**LEGAL STANDARD**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which creates a "highly deferential" standard for reviewing state court rulings and "demands that state court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  Under AEDPA, a federal court may not grant habeas relief unless the state court's ruling was "contrary to, or involved an unreasonable application of," Supreme Court precedent that was "clearly established" at the time the state court adjudicated the claim on the

---

[1] Those claims challenge various aspects and outcomes of the proceedings: (1) failure to hold a *Barker* hearing on petitioner's speedy trial claim; (2) violation of right to a speedy trial; (3) violation of California Penal Code §1382; (4) failure to hold hearing on motion to dismiss under California Penal Code §825; (5) failure to timely arraign petitioner under California Penal Code §825; (6) violations of California Penal Code §§1041 and 1042; (7) violation of double jeopardy; (8) violation of due process from denial of medication; (9) violation of due process from exclusion of petitioner from a hearing; (10) violation of due process from prosecutorial misconduct related to evidentiary irregularities; (11) violation of due process from prosecution's failure to disclose and preserve evidence; (12) failure to hold *Marsden* hearing; (13) violation of right to a fair trial; (14) violation of due process from prosecution's use of false testimony; (15) violation of due process from trial court's refusal to hear motion to strike; (16) violation of confrontation clause; (17) denial of fair trial due to bias of judge; (18) denial of right to self-representation; (19) excessively harsh sentence; (20) unconstitutional sentencing enhancements; (21) grossly disproportionate sentence; (22) ineffective assistance of trial counsel; and (23) ineffective assistance of appellate counsel. Dkt. No. 43.

United States District Court
Northern District of California

merits.  28 U.S.C. § 2254(d)(1); *Greene v. Fisher*, 565 U.S. 34, 39 (2011).

"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Thus, to obtain federal habeas relief from a state court judgement, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  *See also White v. Woodall*, 134 S.Ct. 1697, 1706-07 (2014) ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question.").  This high standard is meant to be "difficult to meet," because "the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38 (citations omitted).

AEDPA's deferential analysis applies only to claims "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 98.  However, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99.  The presumption even applies when a state supreme court summarily denies a claim without issuing a reasoned opinion and "there [is] no lower court opinion to look to." *Wilson v. Sellers*, 138 S. Ct. 1188, 1195 (2018).

In these instances, where "a state court's decision is unaccompanied by an explanation," a federal habeas petitioner's burden "still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.  The obligation of a federal court reviewing such summary adjudications under section 2254(d) is to "determine what arguments or theories… could have supported, the state court's decision," and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme Court]." *Id.* at 102.  Stated differently, relief may only

United States District Court
Northern District of California

3

issue if "no fairminded jurist could conclude that the adjudication was consistent with clearly established Supreme Court precedent." *Mann v. Ryan*, 828 F.3d 1143, 1147 (9th Cir. 2016).

Here, petitioner raised each of his nine claims in separate petitions for review before the California Supreme Court. In each case, the California Supreme Court summarily denied relief. With the exception of two claims—Claim 12, and a subclaim of Claim 22—there is no reasoned "lower court opinion" from which this Court could impute reasoning onto the California Supreme Court's summary denials of petitioner's claims. *Wilson*, 138 S. Ct. at 1195. Thus, with the exception of those claims on which the California Court of Appeal issued a reasoned opinion, the Court must consider which arguments and theories "could have supported" the California Supreme Court's summary denials of petitioner's claims. *Harrington*, 562 U.S. at 102. The Court will then consider whether petitioner has established that no fairminded jurist could conclude that such an adjudication is consistent with federal law as articulated by the Supreme Court. *Id*. For Claim 12 and a subclaim of Claim 22, the Court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson*, 138 S. Ct. at 1192.

## DISCUSSION

### A. Speedy Trial Claim Based on Pre-trial Delays (Claim 2)

In Claim 2, petitioner asserts that a delay of sixty-seven months between his arrest on March 6, 2007, and the commencement of trial on October 2, 2012, violated his speedy trial rights. Petitioner attributes the delay to the state's "bad faith" violations of his due process rights and the state's "denial" of his psychotropic medication.

Petitioner presented his speedy trial claim before the California Supreme Court on May 5, 2011, and that court summarily denied the petition on May 11, 2011. Dkt. No. 117-5 at 2. At that time, the delay was forty-nine months. Because AEDPA limits this Court's review to the record existing before the last state court ruled on the asserted claim, *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), this Court will review petitioner's assertion of the speedy trial right from March 6, 2007, through May 5, 2011. Based on a careful review of the record, the Court concludes that the California Supreme Court could have determined that the delay of forty-nine months did not violate

1
2

petitioner's speedy trial rights, and that fairminded jurists could agree that such a determination is consistent with Supreme Court precedent.

3
4
5

### 1. Background to Petitioner's Claim

#### a. Petitioner's Arrest and Eventual Commitment

6
7
8
9

Petitioner was first arrested on Tuesday, March 6, 2007, in connection with a robbery committed in 2007.  He was not arraigned until the following Monday, March 12, 2007, in violation of Cal. Penal Code § 825, which requires arraignment within 48 hours of arrest (excluding Sundays and holidays).  Dkt. No. 141-1 at 46-47.

10
11
12
13
14
15
16
17
18
19
20

On March 23, 2007, a few weeks later, petitioner appeared with appointed counsel.  Dkt. No. 141-25.  Counsel told the court that petitioner had "gone no time waiver" for the preliminary hearing set for the following week.  *Id*. at 3.  Petitioner then expressed frustrations over the arraignment process and indicated that he no longer wanted appointed counsel to represent him, but instead wanted to represent himself and "obtain my documents so that I will know what I'm being charged with."  *Id*. at 3-4.  After a lengthy discussion, the judge denied petitioner's request for self-representation, finding petitioner "disruptive" and "unable to follow orders."  *Id*. at 3-9.  Around the same time, the presiding judge ordered an inquiry into petitioner's competency due to petitioner's complaints of hallucinations and disorientation.  Dkt. No. 141-14 at 285; Dkt. No. 141-9 at 303.  Criminal proceedings were suspended around March 23, 2007, and, at the time, the court remarked that petitioner was not on a time waiver.  Dkt. No. 141-26 at 3.

21
22
23
24
25
26
27
28

The parties reconvened a few days later, on March 26, 2007, "for the appointment of doctors" to evaluate petitioner's competency to stand trial.  Dkt. No. 141-26 at 3.  The parties appeared again on May 10, 2007, to discuss reports submitted by the two appointed psychologists.  *Id*. at 4.  Because the two psychologists reached opposite conclusions, the parties agreed to appoint a third psychologist, Dr. Burstein, to serve as a "tie breaker."  *Id*. at 4-5.  The parties reported back on June 1, 2007.  *Id*. at 6-7.  Dr. Burstein had found petitioner incompetent, meaning two of the three doctors concluded petitioner was incompetent.  *Id*. at 7.  However, petitioner's counsel asked for an opportunity for Dr. Burstein to reevaluate petitioner:

United States District Court
Northern District of California

> My client has indicated that when he was interviewed by Dr. Burstein, he had been off of his psych medications for at least a week because he had sustained a broken finger for which he was receiving prescribed Vicodin at the jail. He could not mix that. Therefore, when he interviewed with Dr. Burstein, he was not very stable, and the interview did not go well, as is reflected in the evaluation that we have.

*Id*.  The court agreed, but asked petitioner's counsel to talk to Dr. Burstein "and see if we can get it sooner" than the anticipated one-month turnaround.  *Id*. at 10.  Petitioner's counsel stated that his "client was in no particular hurry to have the evaluation prepared…[and] said he would have no objection if this were to go to Monday, July 16th."  *Id*.

Dr. Burstein worked promptly, and the parties returned on June 27, 2007.  Dkt. No. 141-26 at 12.  The record suggests petitioner was present at the morning session but "agreed to waive his appearance" in the afternoon session.  *Id*. at 14-15.  Dr. Burstein again found petitioner incompetent.  In the afternoon session, without petitioner present, petitioner's counsel remarked "I believe that today he was incompetent to aid his attorney or aid in the presentation of a defense at this time."  *Id*. at 17.  The prosecution, on the other hand, expressed its view that petitioner was merely "malingering or delaying this case," and asked the court to go as far as ordering the involuntary administration of medication to restore petitioner's competency.  *Id*. at 16-17.  The parties agreed to submit the question of petitioner's competency on the doctor's reports.  *Id*. at 18.  The court concluded that "there's substantial evidence that Mr. Brown, also known as Wilkins, is not competent at this time."  *Id*.

Two weeks later, on July 12, 2007, petitioner appeared before court and stated that he was "not receiving medication" and was thus unable to "understand what's going on."  Dkt. No. 141-26 at 19.  In response to petitioner's emphasis on medication, the court noted how Dr. Burstein—who examined petitioner twice—was of the same opinion regardless of petitioner's medicated state.  *Id*. at 20.  But the court nonetheless expressed an intention to "try to work with" petitioner by signing an order allowing petitioner to "see someone from mental health to get some medications."  *Id*.

The parties appeared again on July 27, 2007, to discuss potential a mental health treatment placement.  *Id*.  At the hearing, petitioner told the court that he was "taking the meds" that were prescribed to him, but that the Santa Rita County Jail was not giving him the medications that he

United States District Court
Northern District of California

had "taken all [his] life" because the jail considers those medications contraband.  *Id.* at 21 (petitioner remarking: "The ones I'm taking since I was 12 years old are effective. … If I have those meds, I wouldn't waste your time and go to the hospital.").

The court ordered petitioner "committed to Napa State Hospital for a period not to exceed three years" for restoration of competency, *id.* at 23-24, but noted that petitioner could be returned in as little as 90 days pending the treatment's efficacy.  *Id.* at 24.  The court ordered petitioner to be transported to the hospital within two weeks, or by August 10, 2007.  *Id.*

But by September 25, 2007, petitioner had not been transported to the hospital.  The court ordered the state to show cause, by October 23, 2007, why it should not be held in contempt for failing to comply with the transport order.  Dkt. No. 141-14 at 256.  The state finally transported petitioner to Atascadero State Hospital on November 8, 2007.  Dkt. No. 141-15 at 91.  The prosecution fails to explain the delay between the court's initial August 10, 2007, deadline and petitioner's eventual commitment on November 8, 2007.

### b. Petitioner's Competency is Restored and Proceedings Resume

As of March 3, 2008, state doctors had petitioner taking diphenhydramine, Risperdal, Seroquel, and Prozac.  A report submitted to the state court pursuant to Cal. Pen. Code 1371(a)(1) on March 3, 2008, concluded that defendant had an antisocial personality disorder and observed "evidence of intentional production of psychological symptoms in an attempt to avoid adjudication for a serious felony."  Dkt. 141-22 at 36.  Doctors at Atascadero recommended changing defendant's diagnosis "to include a diagnosis of Malingering and the history that is available is suggestive of borderline character pathology."  Dkt. No. 141-22 at 6.

On March 10, 2008, the Atascadero State Hospital certified that petitioner's competency had been restored.  Dkt. No. 141-2 at 186-87.  Importantly, the medical director emphasized that petitioner should "remain on this medication for his own personal benefit and to enable him to" remain competent under state law.  *Id.* at 186.  The medications included diphenhydramine, hydrochloride, Risperdal, Seroquel, and Prozac.  *Id.* at 189-90.  Petitioner was returned to the custody of the Santa Rita Jail on March 19, 2008.

On March 25, 2008, one week after petitioner was returned to Santa Rita Jail, the state filed a first amended criminal complaint against petitioner alleging his participation in the 2006 bank robbery—the second of two robberies for which petitioner would be prosecuted. Dkt. No. 141-1 at 37.

On April 1, 2008, petitioner filed an inmate grievance claiming that the mental health authority charged with providing health services at Santa Rita refused to prescribe him the medications he was given at Atascadero. Dkt. No. 153-9 at 4. The grievance was denied by jail authorities, who stated that the mental health authority "has the sole discretion and responsibility for treatment it prescribes based on the information it collects and the examinations it conducts." *Id*. Petitioner submitted a letter to the state court on April 2, 2008, alleging that "jail officials took me off all my needed mental health medication." Dkt. No. 153-7 at 5-6. Responding to petitioner's ongoing complaints, the state court ordered several medical evaluations of petitioner pursuant to Cal. Pen. Code § 4011.6. *See* Dkt. No. 141-21 at 31 (ordered on April 11, 2008); Dkt. No. 155-9 at 42 (underline: filed under seal) (ordered May 14, 2008); Dkt. No. 141-21 at 33 (ordered May 16, 2008).

Criminal proceedings were reinstated on June 4, 2008. At the June 4, 2008 hearing, petitioner personally agreed to waive time for the period between his arraignment on March 12, 2007 and the suspension of criminal proceedings on March 23, 2007 (10 days), as well as a period of 60 days following arraignment. Dkt. No. 141-27 at 4-5. At the same hearing, petitioner reiterated his complaint that he was not receiving his "meds" in Santa Rita:

> **Prosecution:** Just for the Court's information … I don't believe they give Seroquel at Santa Rita jail.
>
> **Petitioner:** Yes, they do, to lots of people.
>
> **Petitioner's Counsel:** … I had a discussion with Director Millie Swaford and Tom Resberg [from Santa Rita Jail] that they are very, very hesitant to give Seroquel. It's become a drug of abuse. They will do it if the circumstance demands it, and I think that's unless there's a really serious problem. It has to be left to their discretion. If it is a problem, then we do have to go in and get some hearings on that.
>
> **Court:** I'm assuming this is a drug that he has taken or was being prescribed?
>
> **Petitioner's Counsel:** Yes. And this was something that was recommended that he be continued by Atascadero.

**Petitioner**: I took it from Kaiser on the streets every day for 25 days.

**Prosecution**: I'm unclear whether the Court can make an order telling him what medication given the concerns.

**Court**: Certain drugs have been recommended by Atascadero. Is Santa Rita either unable or not willing to go along with that precise recommendation to the extent that it includes Seroquel?

**Petitioner's Counsel:** Yes. Their position is that this is not medication that he needs.

**Petitioner**: But they're not giving me nothing.

**Court**: If I were to make an order that the prescriptions that were suggested or recommended by Atascadero be administered, I don't know what the reaction to that word might be. The sheriff might say our medical personnel are not comfortable administering Seroquel. I'm not enough of an expert or I'm not an expert at all in that field to be able to tell them yes, you must give this to him.

Dkt. No. 141-27 at 6-7. The court declined to order the state to put petitioner on a particular medication but did order that medical staff continue to evaluate petitioner. *Id*. at 9-10.

In the month that followed, jail doctors continued to administer psychiatric medication to petitioner, but not Seroquel. Dkt. No. 141-11 at 256-67. The court ordered a section 4011.6 medical evaluation on July 29, 2008. Dkt. No. 141-21 at 39.

In August 2008, petitioner requested, and the court granted, a motion for self-representation, finding "no doubt that [petitioner] understands the nature of the proceedings against him, that he understands what's going on, that he's able to communicate with counsel, and he's able to communicate with the Court." Dkt. No. 141-29 at 12-13. Petitioner agreed to "maintain the [time] waiver" for an additional thirty days. *Id*. at 14-15.

Petitioner appeared before the court on September 22, 2008. There, he complained that he was still not receiving the "medications I need," but was just "getting the same meds I was getting before" being transferred to Atascadero. Dkt. No. 141-30 at 5, 6. The court expressed an intent to file an order "express[ing] [his] opinion that [petitioner] should be on the drugs that [he] received at Atascadero." *Id*. at 6. The court also sought to persuade petitioner to allow a public defender to be

9

appointed to aid him. *Id.* at 8-10.  A few days later, private counsel of petitioner's own choosing was appointed. Dkt. No. 141-21 at 46.  (This was a highly unusual step taken by the trial court to convince petitioner to utilize counsel instead of proceeding *pro se*.  The court agreed to find "irreconcilable differences" between petitioner and the public defender's office in order to enable the court to appoint private counsel, of petitioner's own choosing, from the California Bar Association. Dkt. No. 141-30 at 8-10.).  On November 21, 2008, petitioner's newly appointed counsel requested that petitioner be transferred to a mental health facility.  Dkt. No. 141-21 at 50. The request was denied.

### c. Proceedings Continue into 2009

On February 4, 2009, a preliminary hearing was held on the charges stemming from petitioner's 2007 bank robbery.  At that hearing, petitioner made a motion for statutory speedy trial violation. Dkt. No. 141-1 at 56.  On February 19, 2009, petitioner entered a not guilty plea and declined to waive time for trial. *Id.* at 264.  However, on March 4, 2009, petitioner's counsel waived time for trial, *id.* at 234, a waiver which petitioner insists was "coerced" by his counsel.  Dkt. No. 141-2 at 7.

On April 24, 2009, petitioner's counsel sought to continue an upcoming hearing date to accommodate his schedule, a decision which petitioner also insists he did not agree with.  Dkt. No. 141-1 at 326; Dkt. No. 141-2 at 7.  One month later, counsel sought, and the court granted, a motion to withdraw.  Petitioner filed a *pro se* response to the motion opposing counsel's withdrawal while simultaneously complaining of counsel's performance.  Dkt. No. 141-2 at 4-5.  New counsel was appointed on May 26, 2009. *Id.* at 17.  Around the same time, petitioner filed a motion requesting mental health treatment, claiming he was being denied medication in Santa Rita Jail. *Id.* at 22-26.

On July 9, 2009, a preliminary hearing was held on the 2006 robberies. *Id.* at 32.  At the hearing, petitioner personally asserted that this speedy trial rights were being violated in the

10

proceedings pertaining to the 2006 robberies. *Id.* at 33. The prosecution responded that petitioner was also being held on the 2007 robberies. *Id.* at 38-39. The court denied the motion for speedy trial violation on that basis. *Id.* at 43.

On August 18, 2009, petitioner requested the court stay proceedings for sixty days to allow him to pursue remedies for various grievances in the higher courts. Dkt. No. 141-3 at 285-89. Relations between petitioner and counsel then deteriorated, leading the court to grant petitioner's motion to proceed *pro se* on November 9, 2009. Dkt. No. 141-31 at 5. In the interim, petitioner began aggressively filing pro se motions and notices. For example, through September and October 2009, petitioner sought to disqualify the presiding judge[2] and personally wrote the judge letters admonishing him for acting unethically and disrespectfully. Dkt. No. 141-2 at 251, 272. On October 26, 2009, petitioner filed a habeas petition alleging the denial of equal protection because the jail bus did not have seatbelts. *Id.* at 283-89. Petitioner also complained of not having a coat, not being given physical therapy, and of the malfeasance of a particular health provider. *Id.* at 290-96.

Appearing *pro se* on December 23, 2009, petitioner indicated he wanted to pursue his speedy trial rights. Dkt. No. 141-10 at 147, 152. At the time, trial was set for March 2010. *Id.* at 145. The court reminded petitioner that he was on a time waiver, and that, if he wished to withdraw the waiver, he would have to be ready for trial by March. *Id.* at 147-48. Petitioner responded that he "can have

---

[2] Moving to disqualify judges became one of petitioner's common *pro se* tactics in the state criminal proceedings. *See* Dkt. No. 141-2 at 251, 272 (moving to disqualify Judge Kurtz); Dkt. No. 141-3 at 715-16 (moving to disqualify Judge McLaughlin because, in petitioner's "opinion," he was "out of control"); Dkt. No. 141-4 at 148 (Judge Goodman being disqualified for not filing a formal response to petitioner's request); Dkt. No. 141-5 at 21 (moving to disqualify Judge Murphy).

Petitioner also moved to disqualify judges in his collateral proceedings in federal court. *See* Dkt. No. 96 (denial of motion to disqualify the undersigned); *Wilkins v. Ahern*, 2010 U.S. Dist. LEXIS 91914, at *3-5 (N.D. Cal. 2010) (denying motion to disqualify Judge Chesney); *Wilkins v. Picetti*, 2013 U.S. Dist. LEXIS 113536, at *2 (N.D. Cal. 2013) (denying motion to disqualify Judge Koh); *Wilkins v. Barber*, 2020 U.S. Dist. LEXIS 193227 (E.D. Cal. 2020) (denying motion to disqualify Magistrate Judge Newman).

a speedy trial but I won't be ready." *Id*. at 152.  Petitioner did not dispute he was on a time waiver.

Petitioner filed another *pro se* habeas petition in state court in January 2010, alleging excessive bail and that an "unauthorized sentence" was imposed in his prior convictions.  Dkt. No. 141-5 at 156-256.  Another petition followed in February 2010, alleging that his privacy rights were violated because jail phone calls were being monitored.  Dkt. No. 141-7 at 22-25.

By mid-2010, petitioner's mental health appeared to decline.  In April 2010, private counsel was appointed to represent petitioner.  Dkt. No. 141-7 at 126.  That counsel did not last long; new counsel, William Du Bois, was substituted in May 2010.  *Id*. at 130.  In May 2010, petitioner's medications were suspended because he had been found "hoarding," and medications had not been reinstated.  Dkt. No. 141-32 at 11-15, 61-62, 58, 63-64.  In June 2010, the court issued another section 4011.6 evaluation as well as an order that petitioner "return to medication."

On September 10, 2010, petitioner appeared and withdrew his time waiver.  Dkt. No. 141-7 at 220.

The court held a hearing in November 2010 (continued on Nov. 17, Dec. 1, and Dec. 8) to determine whether another referral to evaluate petitioner's competence was warranted.  Petitioner's counsel, Mr. Du Bois, expressed doubts as to petitioner's competency:

> Since I have been court-appointed counsel in this case [on May 10, 2010], my client has received no psychotropic medication whatsoever, as that term is used in the letter from Atascadero State Hospital dated March 10th … .  Accordingly I have observed my client deteriorate into a condition where he cannot assist me in the rational presentation of his case. It's almost impossible for me to communicate with him about the facts of his case.  He is overfixated on utter irrelevancies and continually – is nowhere near competent to stand trial. I'm not even convinced that he understands the nature of the proceedings against him, although I – that's not my major concern.

Dkt. No. 141-32 at 15.  Mr. Du Bois' "concern" was that "personnel employed by the sheriff's department and the County of Alameda at Santa Rita have deprived [petitioner] of any psychotropic medication" since May 1, 2011—the date of the hoarding incident.  *Id*. at 15-16.

Petitioner was called to testify.  Petitioner stated that after returning from Atascadero, he

resumed taking all the same medications, but was taken off Seroquel after May 2008.  *Id*. at 25, 33-34.  The lead psychiatrist at Santa Rita, Dr. Chaffin, was called to testify as to why petitioner's medications were not continued after the May 5, 2010 hoarding incident.  Dkt. No. 141-32 at 59, 61-62.  Dr. Chaffin stated that medications are automatically stopped after a hoarding incident and are not resumed until a patient attends a follow up appointment to evaluate next steps.  *Id*. at 62.  According to Dr. Chaffin, petitioner did not attend the follow up meeting, or any of the nine follow up meetings Dr. Chaffin rescheduled (the last one being on October 15, 2010).  *Id*. at 64-66.  Dr. Chaffin then discussed the time period following petitioner's transfer from Atascadero.  She opined that petitioner had actually never been incompetent, but instead had a severe personality disorder that was "not amenable to medication."  Dkt. No. 141-33 at 40; *Id*. at 23 ("I believe that [petitioner] meets the definition for antisocial personality disorder with borderline and narcissistic traits.").

On February 25, 2011, the court denied petitioner's request for a competency evaluation.  Dkt. No. 141-9 at 68.  In the ruling from the bench, the judge referred to petitioner's litigious *pro se* activities[3] throughout the proceedings:

> I've heard testimony from Dr. Chapman both with respect to the original finding in the report of 2008, as well as her own belief that there's basis to believe that Mr. Brown is malingering. I've heard testimony from Dr. Chapman that he does not believe that he has a dissociative identity disorder in her opinion and that the testimony we've heard about these various individuals Mr. Sebastian, Mr. Wilkins, Mr. Brown may be the product of Mr. Brown's efforts to impede the process here. And that gets back, just for reference, to a comment that was made back, way back in 2008 by the doctor who prepared the report that was sent to the court after his restoration or after a finding he was restored, in which the doctor said "I suspect this patient will manufacture more dramatic psychotic symptoms in an attempt to impress other mental health professionals that he is generally incompetent."
>
> So, I think that the question of whether Mr. Brown is incompetent or whether he has presented substantial evidence to cast a serious doubt on the original finding by virtue of his reference to other personalities and other people and his antics, whether that is contrived or

---

[3] Petitioner has filed six cases in this Court (Case Nos. 3:08-cv-1084 MMC, 5:10-cv-2818 LHK, 5:10-cv-1222 JF, 5:10-cv-3090 LHK, 5:10-cv-5331 JF & 5:10-cv-0225 LHK); five cases in the California Court of Appeal (Nos. A125610, A130187, A122259, A124486 & A136231); and twenty-two cases in the California Court of Appeal (Nos. A119110, A125118, A1255757, A126783, A127257, A129066, A129706, A129983, A130650, A130807, A131019, A131680, A131775, A132336, A132575, A132784, A133005, A133193, A133278, A133573 & A133994).

whether or not it is, in fact, as I said, truly the source of some sort of mental disorder or change of circumstances, I don't believe it is. I think Mr. Brown, Nerrah Brown who I've seen, I've watched him testify, I listened to him talk, pretty cogent in many respects, pretty articulate in many respects, pretty intelligent in many respects, and leaves me to think that perhaps if he doesn't communicate with you, or its not a question of his not being able to communicate, it is a question of his choosing not to communicate with you and one could attach various motives to his efforts to not do that given the charges that he's facing and obviously the predicament that he finds himself in.

It has been obviously three years, almost exactly since he has been sent back from Atascadero. There has not been a lot of substantive work done on the case with, between writs that he has filed, grievances he has filed, civil suits he has filed.

It appears to me that he is very capable of taking care of the things that he wants to take care of and addressing the things that he wants to address and devoting attention and intelligent attention to those ideas and those matters that he wants to address. Not many of those happen to deal with the charges against him and one can come to whatever conclusion he or she might want with respect to that but when it comes to his health, when it comes to the civil suits he's filed, when it comes to grievances he's filed, it appears to me he certainly knows what he's doing and he knows how to take care of business.

*Id*. at 66-67.  On April 1, 2011, petitioner entered a plea of not guilty by reason of insanity. *Id*. at 98.  The court appointed psychologists to evaluate petitioner soon after.

Finally, on May 5, 2011, petitioner filed the petition for review in the California Supreme Court raising the speedy trial claim at issue here.  Dkt. No. 117-5 at 2.

### 2. Legal Standard

"[A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case."  *Barker v. Wingo*, 407 U.S. 514, 522 (1972).  The conduct of "both the prosecution and the defendant" must be weighed with particular attention paid to (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Id*. at 530. The inquiry entails a "difficult and sensitive balancing process."  *Id*. at 533.

Not all delays are equally culpable.  For example, a "deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government," while "negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered." *Id*.

14

at 531.  *See also, United States v. Loud Hawk*, 474 U.S. 302, 316 (1986) (delays caused by government's "bad faith or dilatory purpose" give "effective weight" to a speedy trial claim); *Vermont v. Brillon*, 556 U.S. 81, 92 (2009) (delays caused by appointed defense counsel are attributable to the defendant, not the state).  When delays arise, it is the prosecution that "bears the burden of explaining delay in bringing an accused to trial."  *McNeely v. Blanas*, 336 F.3d 822, 827 (9th Cir. 2003).

The Supreme Court has declined to "definitely say how long is too long" a delay to trigger a violation of a defendant's constitutional right to a speedy trial.  *Barker*, 407 U.S. at 521.  Yet, the case law provides helpful guideposts.  For example, in *Doggett v. United States*, the Supreme Court held that the prosecution's "egregious persistence in failing to prosecute" the defendant was "clearly sufficient" to warrant relief given the government's lag of 8.5 years between the defendant's indictment and subsequent arrest.  505 U.S. 647, 657 (1992).  And in *Dickey v. Florida*, the Supreme Court held that a "lapse of almost eight years during which [defendant] repeatedly demanded and was denied a trial" violated the defendant's rights, particularly given the "abundant evidence of actual prejudice … in the death of two potential witnesses, unavailability of another, and the loss of police records."  398 U.S. 30, 37-38 (1970).  In some instances, excessive delays (e.g., more than 8.5 years, as in *Doggett*) may ease the burden on the defendant to demonstrate prejudice and give rise to presumptive prejudice, because such delays can compromise a trial's reliability in unidentifiable ways.  *Doggett*, 505 U.S at 655.

In a more recent case, *United States v. Loud Hawk*, the Supreme Court remarked that "a 90-month delay in the trial of these serious charges is presumptively prejudicial."  474 U.S. 302, 314 (1986).  Yet, *Loud Hawk* did not find the defendant's speedy trial rights violated due to the *reasons* for the delay: "At the same time [defendants] were making a record of claims in the District Court for speedy trial, they consumed six months by filing indisputably frivolous petitions for rehearing and for certiorari … [and] filled the District Court's docket with repetitive and unsuccessful motions."  *Id*. at 314-15.  Although the *Loud Hawk* defendants asserted their speedy trial rights, the Supreme Court was disinclined to give the factor much weight in "light of [defendant's] other conduct."  *Id*. at 314.

United States District Court
Northern District of California

Here, petitioner raised his speedy trial claim in a petition for review in the California Supreme Court, which summarily denied the claim. When evaluating petitioner's claim under AEDPA, this Court does not consider whether, in its own judgement, petitioner has established a speedy trial violation under the legal framework set forth above.  Rather, this Court "must determine what arguments or theories supported or, as here, could have supported" the California Supreme Court's summary denial, "and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  *Harrington*, 562 U.S. at 102.

### 3. Discussion

For the reasons set forth below, the Court concludes that the trial record provided the California Supreme Court with sufficient evidence to find—and for fairminded jurists to agree—that petitioner's speedy trial rights were not violated.

#### a. Length of Delay

The total time elapsed from petitioner's arrest to when the speedy trial claim was exhausted in a petition for review was forty-nine months, or four years and one month.  The Supreme Court recognizes that delays of more than four years are "too long a period," particularly when "a good part of that period" is attributable to the state's failure or inability to try a defendant "under circumstances that comport[] with due process."  *Barker*, 407 U.S. at 534.  However, the other three factors in the analysis must still be considered.  *Id*.

#### b. Reason for Delay

The record indicates that only a portion of the period of forty-nine months is directly attributable to the state's failure to prosecute.  Since the early stages, the prosecution sought to promptly try petitioner even if it meant involuntarily administering medication to ensure petitioner's competency.  Given this context, the delay in transporting petitioner to a state mental hospital does not appear to be the result of the state's "bad faith or dilatory purpose" in delaying the proceedings.

*Loud Hawk*, 474 U.S. at 316.   Similarly, delays caused by the state's inability to perfect petitioner's mental health treatment does not evince bad faith.   Instead, the record suggests that there was considerable room for disagreement among medical professionals regarding petitioner's diagnosis and the proper course of treatment, and jail officials were under no obligation to defer to petitioner's preference for a particular type of medication.

Several delays were the result of petitioner's own ongoing desire to get rid of his appointed counsel and obtain newly appointed counsel, only to find himself dissatisfied with new counsel.   *See* Dkt. Nos. 141-25 at 3-4 (March 2007: petitioner requesting new counsel or self-representation at initial appearance); 141-29 at 12-13 (August 2008: petitioner discharging counsel and asserting self-representation); 141-21 at 45 (September 2008: new private counsel, of petitioner's own choosing, appointed); 141-2 at 15, 17 (May 2009: new counsel appointed); 141-2 at 251 (September 2009: court denying petitioner's *Marsden* motion seeking new counsel); 141-7 at 126, 130 (April 2010 and May 2010: new counsel appointed back to back); 141-7 at 224 (September 2010: petitioner files *Marsden* motion to discharge counsel); 141-7 at 275 (October 2010: petitioner files *Marsden* motion to discharge counsel).   Further, petitioner's vigorous *pro se* filings, motions, and letters slowed the criminal proceedings.   At times, the delay was of petitioner's own request.   *See* Dkt. No. 141-3 at 285-89 (petitioner's August 18, 2009, request to stay proceedings for sixty days).

Thus, even affording the most generous reading of the chronology of events from petitioner's arrest on March 6, 2007, through May 5, 2011, the Court cannot attribute the entire 49 months to the state.   At most, the Court finds 336 days, or 11 months, attributable to the state:

- o Delay from petitioner's arrest for the 2007 robbery to eventual arraignment: 3 days
- o Delay in transporting petitioner from jail to state hospital in 2007: 90 days
- o Delay in filing criminal complaint after return to jail in March 2008: 6 days
- o  Delay from withdrawal of time waiver in 2010 to the date of the petition: 237 days

Eleven months falls far below the threshold for presumptive prejudice.   Accordingly, the Court proceeds to other factors in the speedy trial analysis.

1

2                             **c. Assertion of the Right**

3           Petitioner claims that he adamantly asserted his rights to a speedy trial throughout the forty-

4 nine-month period culminating in his petition for review.  The record indicates that petitioner did

5 make such assertions.  However, in "light of [petitioner's] other conduct," *Loud Hawk*, 474 U.S. at

6 314, the Court is disinclined to give this factor much weight.  *See* Dkt. Nos. 141-2 at 33 (July 2009:

7 asserting right); 141-3 at 285-89 (August 2009: requesting a stay of sixty days); 141-10 at 147-48

8 (December 2009: asserting right); *Id.* at 152 (December 2009: stating he would not be ready for trial

9 within two months).  The Court also notes petitioner's voluminous filings and lawsuits in collateral

10 matters when weighing the sincerity of petitioner's assertion of his speedy trial rights.

11

12                             **d. Prejudice**

13           Petitioner asserts that prejudice resulted from various factors, including his lapses in and out

14 of competency, the lack of continuity brought on by new lawyers, and the loss of a video allegedly

15 containing evidence of one of the robberies.  The Court cannot conclude that these consequences,

16 although undesirable, led to "actual prejudice."  *Dickey,* 398 U.S. at 37-38 (holding that "abundant

17 evidence of actual prejudice" existed "in the death of two potential witnesses, unavailability of

18 another, and the loss of police records").

19           Based on the trial court record, the Court concludes that the California Supreme Court could

20 have engaged in the "difficult and sensitive balancing process" of the four factors set forth in *Barker*,

21 407 U.S. at 530, and considered the guideposts offered by *Doggett, Dickey,* and *Loud Hawk* to

22 conclude that petitioner's rights to a speedy trial were not violated.  Because petitioner has not

23 established that all fairminded jurists would agree that such an outcome is inconsistent with Supreme

24 Court precedent, relief on the speedy trial claim is denied.

25

26 **B. Due Process Claim Based on Prosecutions' Alleged Reneging of Stipulation (Claim 7)**

27           Petitioner's Claim 7 alleges his due process rights were violated when he was "goad[ed]"

28 into requesting a mistrial in his criminal case based on the prosecutor's promise that, if he requested

United States District Court
Northern District of California

a mistrial, the prosecution would stipulate to petitioner's mental incompetency to stand trial.  Dkt. No. 115 at 11.  Thus, petitioner argues, his second jury trial for the bank robberies subjected him to double jeopardy.

### 1. Background to Petitioner's Claim

In late 2011, petitioner's criminal trial was suspended, and a separate jury trial began pursuant to Cal. Penal Code §§ 1368, 1369, to determine petitioner's mental competency to stand trial for the underlying criminal complaint.  The jury was unable to reach a unanimous verdict on petitioner's competency to stand trial.  Dkt. No. 141-56 at 75-76,

On December 14, 2011, the state court granted petitioner's motion for a mistrial in the competency trial.  *Id*.  Afterwards, the court reminded the parties that "another jury [was] in abeyance," referring to the jury that had been impaneled and sworn in for the then-suspended criminal trial.  *Id*. at 79.  The court inquired into how it should proceed:

> **The Court:** Mr. DuBois [petitioner's counsel], you're also asking for a mistrial as to [the suspended criminal trial]?
>
> **Mr.** DuBois: Yes.
>
> **The Court:** And Mr. Burke [prosecution], any input?
>
> **Prosecutor**: I would like to reserve comment on that. I don't think it's absolutely necessary to make a decision on that mistrial.

*Id*.  A follow-up hearing was held one week later on December 20, 2011.  At that hearing, both parties expressed their agreement that a mistrial was warranted in the criminal case due to the ongoing indeterminacy of petitioner's competency.  Dkt. No. 141-16 at 253-54.  Thereafter, the state court "declare[d] a mistrial as to the underlying case."  *Id*. at 254.

Petitioner's Claim 7 alleges that, at some point before counsel requested a mistrial in the criminal case, the prosecution had agreed to stipulate to petitioner's incompetency.  Petitioner brought this supposed agreement to the state court's attention in a written objection filed on January 5, 2011.  *Id*. at 125.  In the written objection, petitioner asserted that an agreement to stipulate to

1    incompetency had been reached, but the parties were unable to get a judge to sign off on the

2    stipulation, which eventually allowed the prosecution to withdraw its assent to the stipulation.  *Id*.

3    at 126.

4          As further evidence of this supposed agreement, petitioner points to a note, dated August 28,

5    2012, which appears to be in petitioner's handwriting but is signed by Mr. Du Bois (his counsel at

6    the time).  Dkt. No. 141-19 at 97-98.  The note states that Mr. Du Bois would not have requested a

7    mistrial in the criminal case but for a "belief," based on "informal discussions" held after December

8    14, 2011, that the prosecution would stipulate to incompetency.  *Id*.  The note states that on

9    December 22, 2011, the prosecution informed Mr. Du Bois that it would not stipulate to petitioner's

10   incompetency and instead "would retry competency."  *Id*. at 97.

11         Petitioner submitted another declaration from Mr. Du Bois along with his Second Amended

12   Petition on September 21, 2020.  Dkt. No. 116.  The 2020 declaration states that discussions between

13   the prosecution and Mr. Du Bois occurred both before and after December 14, 2011.  *Id*. at 2.  In

14   the declaration, Mr. Du Bois states that due to "affirmative declarations during those discussions, I

15   believed [the prosecutor] would stipulate to incompetency."  *Id*. at 3.

16         Petitioner asserts the prosecutions' failure to honor its promise "severely prejudice[d] [him]

17   because he was subjected to prosecution when he would not have been had the stipulation been

18   entered into the record."  Dkt. No. 45 at 20.  Petitioner previously raised and properly exhausted this

19   claim before the California Supreme Court, which summarily denied petitioner's request for review

20   on May 9, 2012.  Dkt. No. 77 at 29.

22        **2. Legal Standard**

23         The Double Jeopardy Clause protects "a defendant against governmental actions intended to

24   provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by

25   multiple prosecutions."  *United States v. Dinitz*, 424 U.S. 600, 611 (1976) (referring to actions "done

26   in bad faith in order to goad the [defendant] into requesting a mistrial").   However, the

27   "reprosecution of a defendant who has successfully moved for a mistrial is not barred" under the

28   double jeopardy clause "so long as the Government did not deliberately seek to provoke the mistrial

1   request." *United States v. DiFrancesco*, 449 U.S. 117, 130 (1980); *see also United States v. Jorn*,

2   400 U.S. 470, 485 (1971) ("where circumstances develop not attributable to prosecutorial or judicial

3   overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to

4   reprosecution").

5       When, as here, "state courts issue summary rulings," the court conducting AEDPA review

6   must determine what "arguments or theories…could have supported, the state court's decision."

7   *Harrington,* 562 U.S. at 99, 102.  The court must then "ask whether it is possible fairminded jurists

8   could disagree that those arguments or theories are inconsistent with the holding in a prior decision

9   of [the U.S. Supreme Court]." *Id.*

10

11       **3. Discussion**

12       Based on the trial court record existing when the California Supreme Court considered

13   petitioner's claim, the Court concludes that the state court could have rejected petitioner's claim due

14   to insufficient evidence of prosecutorial bad faith.

15       The record does not contain a draft of any written stipulation.  At most, the record suggests

16   the parties expressed interest in entering into a future agreement, but that no actual agreement

17   resulted from these "informal discussions." Dkt. Nos. 141-61 at 65, 141-62 at 17-18, 141-56 at 79;

18   141-19 at 97-98.  The evidence does indicate that Mr. Du Bois "believed" the prosecution would

19   stipulate to incompetency.  Dkt. No. 141-19 at 97-98.  The subsequent declaration, signed by Mr.

20   Du Bois in 2020, similarly indicates that "on the informal discussions … with D.A. Burke, his

21   affirmative declarations during those discussions, [Mr. Du Bois] believed he would stipulate to

22   incompetency." Dkt. No. 116 at 3.

23       To turn petitioner's counsel's belief into a legally actionable promise, petitioner directs the

24   Court's attention to *United States v. Savage*, in which the Ninth Circuit held that plea agreements

25   not actually approved by the court may nonetheless bind the government if the defendant

26   detrimentally relies on a "prosecutorial promise." 978 F.2d 1136, 1138 (9th Cir. 1992) (citations

omitted).  However, petitioner fails to cite to Supreme Court case law for the proposition that such promissory estoppel could give rise to a due process claim based on an agreement to enter into a stipulation.

To establish a due process violation, petitioner would instead need to demonstrate that the government's reneging was "done in bad faith in order to goad the [defendant] into requesting a mistrial."  *Dinitz*, 424 U.S. at 611.  The California Supreme Court could have concluded, based on the record, that the prosecution did not act in bad faith.

The California Supreme Court could have also concluded that, even if petitioner's rights were violated, he was not prejudiced by the prosecution refusing to stipulate to incompetency after petitioner requested a mistrial.   The state court could have found it exceedingly likely that a mistrial would have been ordered by the trial court out of necessity, notwithstanding petitioner's request. On December 20, 2011, before granting petitioner's request for a mistrial in the criminal case, the state court remarked that it seemed "unrealistic to think that [a decision on petitioner's competency would] magically occur before January 3rd, [2012]."  Dkt. No. 141-16 at 253.  In fact, by the time a juror deadlock was evident in the competency trial, the jury in petitioner's criminal trial "had been frozen literally for two months."  Dkt. No. 141-62 at 31 (hearing on January 17, 2012).   The California Penal Code contemplates this exact scenario when it permits a judge to discharge jurors in a criminal trial when "undue hardship to the jurors would result if the jury is retained on call" pending the outcome of a competency determination.  Cal. Penal Code § 1368(c).

Thus, due to the length of time the jury had been retained, the California Supreme Court could have concluded that, even absent petitioner's motion for a mistrial, a mistrial was inevitable. *See, e.g., United States v. Brandner*, 90 F. Supp. 3d 883, 886-89 (D. Alaska 2015) (holding "manifest necessity" for mistrial existed after 16-week delay from time that an impaneled jury last heard testimony).  *See also Renico v. Lett*, 559 U.S. 766, 774 (2010) (describing the "broad discretion" trial judges have to declare mistrials "when there is a 'high degree' of necessity" for

doing so).

Thus, the Court finds that the California Supreme Court could have rejected petitioner's double jeopardy claim based on an objectively reasonable application of the governing law to the facts presented. Petitioner has not established that no fairminded jurist could agree that such an outcome is consistent with federal law.

**C. Due Process Claim Based on Denial of Medications and Commitment (Claim 8)**

In Claim 8, petitioner asserts two subclaims based on the Fourteenth Amendment's due process clause. First, he asserts that his right to meaningfully participate in trial was violated by the Santa Rita Jail mental health staff's ongoing refusal to prescribe him Seroquel. Second, he asserts that his commitment at Atascadero State Hospital impinged on his due process rights because he was not afforded adequate notice or an opportunity to be heard at the competency hearing.

The California Supreme Court summarily denied relief on petitioner's first claim on March 28, 2012, thereby exhausting the claim. Dkt. Nos. 70-4, 77 at 11. The second claim was exhausted in a petition for review denied by the California Supreme Court on April 27, 2011. Dkt. No. 117-23 at 3. Based on careful review of the record, the Court cannot conclude that the California Supreme Court's summary denials were inconsistent with federal law.

**1. Background to Petitioner's Claims**

The chronology relevant to petitioner's Claim 8 is presented in Section III.A.1. of this Court's Order discussing the speedy trial claim. In short, the trial judge expressed doubts as to petitioner's competency around March 23, 2007. Dkt. No. 141-14 at 285; Dkt. No. 141-9 at 300-03. Two doctors were initially appointed to evaluate petitioner; a third doctor was later added as a tie breaker. Dkt. No. 141-26 at 4-5. After the doctors prepared their reports, the parties appeared before the trial court on June 27, 2007. Petitioner was present in the morning, but "agreed to waive his appearance" in the afternoon session. *Id*. at 14-15. Based on the reports submitted by the doctors

United States District Court
Northern District of California

and the arguments raised by the parties—including petitioner's own counsel's remark that petitioner was "incompetent to aid his attorney or aid in the presentation of a defense"— the court concluded that petitioner was incompetent. *Id*. at 17, 18.

But the court did not formally commit petitioner to a state hospital until July 27, 2009, at a hearing in which petitioner was present. The court and petitioner discussed what commitment would entail, and the court informed petitioner that he would be returned to jail once his competency was restored. Dkt. No. 141-26 at 23-24.

The record indicates that over the next two years, petitioner struggled to maintain his competence. Petitioner attributes these lapses in and out of competence to the state's refusal to prescribe and administer Seroquel—a psychotropic medication petitioner asserts he had taken since he was 12 years old. Dkt. No. 141-26 at 21-22. Health officials at Atascadero did put petitioner on Seroquel (along with other medications), but health officials at Santa Rita Jail were of the opinion that the proper treatment for petitioner's condition did not call for Seroquel, and so petitioner was prescribed alternative medications.

**2. Legal Standards**

The conviction of a criminal defendant while he is mentally incompetent violates due process. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). "[S]tate procedures must be adequate" to ensure that defendants are only tried while competent. *Id*. California guards these rights through detailed procedures applicable to defendants before trial or after conviction:

> (a) If, during the pendency of an action…a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. If the defendant is not represented by counsel, the court shall appoint counsel. At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time.

> (b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the superior court.

At times, a competency hearing may lead the court to conclude that involuntary commitment is required to restore a defendant's competency to stand trial. "[F]or the ordinary citizen, commitment to a mental hospital produces 'a massive curtailment of liberty,'" *Vitek v. Jones*, 445 U.S. 480, 491 (1980) (citation omitted), and the curtailment is no less consequential for convicted felons, who must still be given "procedural protections" before being placed into involuntary psychiatric treatment. *Id*. at 494.

The Ninth Circuit has long recognized that a defendant's right to be present at a competency hearing protects a defendant's interest in not being involuntary committed but is "intricately linked to the fullness of a defendant's ability to defend against the charge." *Sturgis v. Goldsmith*, 796 F.2d 1103, 1108 (9th Cir. 1986). The "function" of a competency hearing, the Ninth Circuit writes, "is to ensure that no defendant is subjected to trial if his 'mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense.'" *Id*. (quoting *Drope v. Missouri*, 420 U.S. 162, 171 (1975)). Thus, the Ninth Circuit guarantees a "constitutional right to be present at a pretrial competency hearing" as well as a constitutional right "to testify at one." *United States v. Gillenwater*, 717 F.3d 1070, 1079 (9th Cir. 2013). And these rights are "personal," in that they "may be relinquished only by the defendant." *Id*. at 1079–80.

The Ninth Circuit's stance on the necessity of a defendant's presence at a competency hearing flows from the Supreme Court's long-standing principle that defendants have a right to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). However, the Supreme Court itself has never articulated a "definitive list" of critical stages,

*Musladin v. Lamarque*, 555 F.3d 830, 839 (9th Cir. 2009), or expressly held that a defendant's competency hearing would qualify as a critical stage. *Cf. Stincer*, 482 U.S. at 747 n. 21 (denying a due process claim based on defendant's absence from a *child witness's* competency hearing because defendant "failed to establish that his presence at the [witness's] competency hearing would have contributed to the fairness of the proceeding.").

Although the Ninth Circuit has a robust case law recognizing a right to be present at competency hearings, a federal court may only grant relief under section 2254(d)(1) of AEDPA if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). *See Lopez v. Smith*, 574 U.S. 1, 9 (2014) (reversing grant of writ where "the Ninth Circuit cited only its own precedent for establishing the appropriate standard"). Because the California Supreme Court summarily denied petitioner's claims, the Court must "determine what arguments or theories … could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

### 3. Discussion

Based on the applicable case law and careful review of the record, the Court cannot conclude that the available grounds of the California Supreme Court's denial of petitioner's claims would be inconsistent with the Supreme Court's holdings.

First, petitioner's assertion that he was denied the opportunity to meaningfully participate in his own defense due to the state's denial of Seroquel fails on both the law and facts. While criminal defendants undoubtedly have a right to be tried only while mentally competent, petitioner fails to cite to any Supreme Court precedent establishing a right to receive a preferred medication,

United States District Court
Northern District of California

particularly where jail doctors conclude that such a medication is not appropriate. Petitioner's citation to the Ninth Circuit case of *Tolbert v. Eyman* does not advance his claim, as that case involved a jail warden denying an inmate medication that was *prescribed and authorized* by jail doctors. 434 F.2d 625, 626 (9th Cir. 1970). Further, petitioner himself admits that his criminal culpability was not adjudicated while he was incompetent: "Appellate counsel's first claim, that Petitioner was tried while incompetent, ignores the trial record: that he proceeded to trial after the State agreed to give him Seroquel." Dkt. No. 156 at 61 (petitioner's briefing on ineffective assistance of appellate counsel claim). Accordingly, the California Supreme Court could have concluded—consistent with the holdings of the Supreme Court—that petitioner's due process rights to be tried while competent and meaningfully participate in his defense were not violated by the denial of Seroquel.

Second, petitioner's assertion that his due process rights were violated due to his absence from the competency hearing fails on the law. The Supreme Court has never held that competency hearings are critical stages requiring a criminal defendant's presence.

Even if the Court were permitted to rely solely on Ninth Circuit law, the record would provide an arguable basis for the California Supreme Court to conclude that petitioner's due process rights were respected. As early as March 23, 2007, the trial court informed petitioner that it harbored doubts as to petitioner's competency. *See* Dkt. No. 141-14 at 284 ("[T]hey brought me back [on March 23, 2007] and then [the judge] said he thought I was incompetent."). The record further indicates petitioner was aware of and involved in the creation of the medical reports used to evaluate his competency. Dkt. No. 141-26 at 7-10 (discussing re-evaluation from a third doctor). On July 12, 2007, petitioner appeared before the court to express his grievances that he was not receiving his preferred medication and therefore could not "understand what's going on." Dkt. No. 141-26 at 19. And on July 27, 2007, the day the court decided to commit petitioner to a state hospital, the court provided petitioner an opportunity to express his opinions and ask questions about his future

27

commitment. *Id*. at 21-24.

Finally, even assuming that there were gaps in petitioner's full presence and participation in the competency proceeding, the Court cannot conclude that additional due process would have contributed "to the fairness of the procedure." *Stincer*, 482 U.S. at 745. The combined statements of the doctors, attorneys (including petitioner's own counsel), and even petitioner himself indicate that commitment would have resulted even if petitioner had additional opportunities to testify and present evidence. Thus, the California Supreme Court could have concluded, based on the record and applicable law, that the due process petitioner was afforded in the commitment proceeding was consistent with the holdings of the U.S. Supreme Court, and petitioner has not established that no fairminded jurist could concur with such a determination.

### D. Eighth Amendment Claim Based on Length of Sentence (Claim 21)

In Claim 21, petitioner asserts that his aggregate term of imprisonment of 100 years to life violates the Eighth Amendment prohibition of cruel and unusual punishment. Petitioner raised this claim in a habeas petition filed in the California Supreme Court, which summarily denied the petition on April 13, 2016. Dkt. No. 77 at 19. Based on a careful review of petitioner's criminal history, including the charged offenses, the Court cannot conclude that the California Supreme Court's denial of petitioner's claim was inconsistent with federal law, as it would have been reasonable to not draw an inference of gross disproportionality.

#### 1. Background to Petitioner's Claim

Two bank robberies, occurring several months apart, formed the factual basis for petitioner's sentence. *See* Dkt. No. 141-8 at 2113-2128 (Amended Information, Oct. 28, 2010). The first occurred on August 14, 2006 in Fremont, California; the second occurred on January 26, 2007 in Hayward, California. *Id*. at 2113, 2121. In the Fremont robbery, petitioner entered a Patelco Credit Union wearing a ski mask and brandishing a BB gun along with an accomplice, Samuel Bryant.

Dkt. No. 141-20 at 5825. Inside, petitioner pointed the weapon at an employee and threatened to shoot him if the person "in charge" did not present themselves. *Id*. After being led to the vault, petitioner threatened that if the vault was not opened within 45 seconds, he would "blow that employee's brains out." *Id*. Petitioner made off with over $55,000. *Id*.

The Hayward robbery followed a similar playbook. *Id*. at 5826. There, petitioner entered a Provident Credit Union wearing a hoodie and holding "what appeared to be a gun." *Id*. He forced everyone to the back of the premises, pointed the weapon at a person, and threatened: "If you don't tell me who's in charge, I'm going to shoot him." *Id*. He forced the bank manager to open the vault and made off with $83,000. *Id*.

Based on these robberies, the jury convicted petitioner of seven counts of second-degree robbery, Cal. Penal Code § 211 (Counts 1, 2, 3, 12, 13, 14, 15), seven counts of false imprisonment by violence, *id*. § 236 (Counts 4, 5, 6, 7, 8, 9, 10), and one count of making criminal threats, *id*. § 422 (Count 11). Dkt. No. 141-18 at 161-175. The jury, however, indicated petitioner did not "personally use a firearm" while committing any of the charged offenses. *Id*.; Dkt. No. 141-18 at 5273.

The jury also found petitioner to have had committed five prior offenses, as alleged in the amended complaint. Dkt. No. 141-20 at 5772; Dkt. No. 141-8 at 2123-2128. Specifically, the jury found that petitioner had previously been convicted of four felony counts of second-degree robbery in Alameda County on April 5, 1999, Cal. Penal Code § 211. Dkt. No. 141-18 at 5278-81. For those four prior counts, petitioner was previously sentenced to eleven years in prison. Dkt. No. 141-20 at 5805. The jury also found petitioner had been convicted of one felony count of first-degree robbery in Contra Costa County on March 16, 2001, *id*. § 211, Dkt. No. 141-18 at 5282. For the Contra Costa prior, petitioner was sentenced to two years. Dkt. No. 141-71 at 185.

The trial court imposed a sentence of 100 years to life with the possibility of parole. Dkt. No. 141-23 (Report and Sentence). Because the Hayward and Fremont robberies were separate incidents, and because petitioner had five serious felony priors, the trial court was required by Cal. Penal Code § 1170.12(a)(6) to impose consecutive sentences for the robberies. Further, the trial court was required by Cal. Penal Code § 1170.12(c)(2)(A) to impose sentencing enhancements for

1    each of the robberies.  Accordingly, the trial court imposed a sentence of 25 years to life with the

2    possibility of parole for the second-degree robbery alleged in Count 1, and a consecutive sentence

3    of 25 years to life with the possibility of parole for the second-degree robbery alleged in Count 12.

4         The trial court then applied five recidivist enhancements, to run consecutively to each of

5    Count 1 and Count 12. Each of the five priors triggered a five-year sentence, which, when

6    aggregated and applied separately to Count 1 and 12, added 50 years to petitioner's term, to run

7    consecutive to the two 25-year terms, for a total of 100 years.  The court then added several

8    concurrent sentences: two years for each of the seven false imprisonment counts, and 30 years for

9    each of the five priors.  The "maximum exposure," according to the government, would have been

10   a sentence of 513 years.  Dkt. No. 141-20 at 5829.

11        In the Amended Petition, petitioner argues that the sentence of 100 years to life is grossly

12   disproportionate to the crimes committed, particularly given that no real guns were used in the bank

13   robberies and the jury acquitted petitioner of personally using a firearm.  Dkt. No. 45 at 35. Petitioner

14   further argues that, given his age at the time of conviction (44), the aggregate length of his sentence

15   amount to a sentence of life without parole.  Dkt. No. 70-8 at 7.

16

17        **2. Legal Standard**

18        The Eighth Amendment's prohibition against "cruel and unusual punishment" extends to

19   "sentences that are disproportionate to the crime committed."  *Solem v. Helm*, 463 U.S. 277, 284

20   (1983).  While the Supreme Court has recognized that the standard of "gross disproportionality" is

21   "clearly established" for purposes of assessing the constitutionality of sentences for terms of years,

22   *Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2002), the "precise contours" of the gross

23   disproportionality principle are "unclear," rendering habeas relief based on sentence length

24   "exceedingly rare."  *Harmelin v. Michigan*, 501 U.S. 957, 998 (1991) (Kennedy, J., concurring in

25   part); *Lockye*, 538 U.S. at 77 ("The gross disproportionality principle reserves a constitutional

26   violation only for the extraordinary case.").   The lack of clarity in the governing principle thus

27   "gives legislatures broad discretion to fashion a sentence that fits within the scope of the

28   proportionality principle."  *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).

United States District Court
Northern District of California

When reviewing sentences under the Eighth Amendment, courts should consider the following factors articulated in *Solem*: (1) the gravity of the offense and the harshness of the penalty, (2) a comparison of sentences imposed on other criminals in the same jurisdiction, (3) sentences imposed for the same crime in other jurisdictions.  463 U.S. at 291.  When considering the proportionality of an offender's sentence under the first factor, a court must keep in mind that "[r]ecidivism has long been recognized as a legitimate basis for increased punishment." *Ewing v. California*, 538 U.S. 11, 25 (2003) (sentence imposed under California three strikes law "reflects a rational legislative judgment, entitled to deference, that offenders who have committed serious or violent felonies and who continue to commit felonies must be incapacitated.").  Further, if a court applies the first factor and finds that an offender's sentence does not raise an inference of gross disproportionality, the court need not perform a the comparative intrajurisdictional or interjurisdictional analysis. *See Ramirez v. Castro*, 365 F.3d 755, 766, 770 (9th Cir. 2004), as amended (Apr. 27, 2004) (citing *Ewing*, 538 U.S. at 41-43).

Because the California Supreme Court summarily denied petitioner's claim, AEDPA requires this Court to "determine what arguments or theories…could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

### 3. Discussion

Petitioner was sentenced as a recidivist under the Three Strikes law.  Thus, "'in weighing the gravity' of his offense in our proportionality analysis [i.e., *Solem's* first factor], 'we must place on the scales not only his current felony,' but also his criminal history." *Ramirez*, 365 F.3d at 768 (quoting *Ewing*, 538 U.S. at 29).

The present offenses for which petitioner was sentenced are considered "serious felonies" under Cal. Penal Code § 1192.7, and the Court cannot say that petitioner's present offenses "were nonviolent in nature." *Ramirez*, 365 F.3d at 768.  Petitioner brandished what appeared to be a firearm, pointed that device at bystanders, and threatened bank employees with death if they did not

comply with his orders.  The Fremont and Hayward bank robberies were nothing like the nonviolent triggering offense in *Solem*, which was "uttering a 'no account' check for $100." 463 U.S. at 281 (granting relief, on direct review, from a sentence of life without parole based on gross disproportionality).

Petitioner's adult prior criminal history evinces a "pattern of increasing violence" that culminated in the two bank robberies.  *Banyard v. Duncan*, 342 F. Supp. 2d 865, 873 (C.D. Cal. 2004) (discussing *Ewing*, 538 U.S. at 18).  As an adult, petitioner was convicted of four felony counts of second-degree robbery, Cal. Penal Code § 211, Dkt. No. 141-18 at 5278-81, one felony count of first-degree robbery, § 211, *id*. at 5282, and one misdemeanor count for willfully resisting, delaying, or obstructing a public officer, § 148(a), for which he was sentenced to three years of probation, Dkt. No. 141-20 at 198-99.  Petitioner has two prior parole violations.  *Id*. at 199.

Petitioner's juvenile record also evinces a pattern of reoffending.  As a minor, petitioner had several petitions sustained against him: two misdemeanor petitions for property theft, Cal. Penal Code § 484, Dkt. No. 141-20 at 197, two misdemeanor petitions for resisting, delaying, or obstructing a public officer, § 148(a), *id*., two misdemeanor petitions for attempting to escape from juvenile hall, Cal. W.I.C. § 871, *id*., one felony petition for battery, Cal. Penal Code § 242, *id*., another felony petition for battery against a peace officer, § 243, *id*., and a final petition alleging escape from juvenile hall, and two counts of battery.  *Id*.

Petitioner's priors do not resemble those of *Solem*.  There, the defendant was previously convicted of three counts of third-degree burglary, one count of obtaining money under false pretenses, one count of grand larceny, and driving while intoxicated.  *Solem*, 463 U.S. at 279-80. The Supreme Court remarked that the prior offenses in *Solem*, "although classified as felonies, were all relatively minor. All were nonviolent and none was a crime against a person." *Id*. at 296-97.  In contrast, petitioner's five prior counts for robbery are classified in the statute as crimes "against a person."  Cal. Penal Code § 211.

Even the "[im]precise contours" of the gross disproportionality principle suggest that petitioner's sentence falls within what is constitutionally permitted by Supreme Court precedent. *Harmelin*, 501 U.S. at 998.  In *Lockyer*, for example, the defendant was sentenced to two consecutive

25-year sentences for two felony counts of petty theft, in which he stole approximately $150 worth of video tapes. 538 U.S. at 66. The defendant's priors were extensive: one count of misdemeanor theft, three counts of first-degree residential burglary, one federal count for transporting marijuana, another count for misdemeanor theft, another federal marijuana count, and an arrest for attempting to escape from federal prison. *Id*. at 66-67. The Ninth Circuit granted defendant's Section 2254(d)(1) petition based on gross disproportionality. But the Supreme Court reversed, finding that this was not the "extraordinary case" that the "gross disproportionality principle [renders] a constitutional violation," and that the California Court of Appeal was not unreasonable in so holding. *Id*. at 77.

Here, petitioner similarly received two consecutive 25-year sentences for each respective felony count, with the possibility of parole. Unlike in *Lockyer*, however, petitioner did not simply walk out of a K-Mart with video tapes; he walked out of two bank with over one-hundred-thousand dollars obtained through threats of violence. *Cf*., *Rummel v. Estelle*, 445 U.S. 263, 275 (1980) ("the presence or absence of violence does not always affect the strength of society's interest in deterring a particular crime or in punishing a particular criminal.").

Petitioner's record also rivals that of William Rummel, who received a mandatory life sentence for obtaining $120 by false pretenses. *Id*. at 266. While Rummel would have faced between two and ten years in prison for the offense, the prosecution proceeded against him under Texas' recidivist statute, citing two prior offenses: (1) fraudulent use of a credit card to obtain $80 worth of goods of services, and (2) passing a forged check in the amount of $28. *Id*. at 265-66. In affirming the Fifth Circuit's decision that Rummel's sentence was not grossly disproportionate, the Supreme Court in *Rummel v. Estelle* noted: "the interest of the State of Texas here is not simply that of making criminal the unlawful acquisition of another person's property; it is in addition the interest, expressed in all recidivist statutes, in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law." *Id*. at 276.

Based on a careful analysis of petitioner's criminal history, a review of the Supreme Court's pronouncements of what constitutes a grossly disproportionate sentence, and the provision of

United States District Court
Northern District of California

adequate deference to the California legislature, the Court cannot conclude that petitioner's sentence of 100 years with the possibility of parole violates the gross disproportionality principle. Accordingly, the Court need not reach steps two and three of *Solem*. Further, the Court finds that the analysis presented above could have supported the California Supreme Court's summary denial of petitioner's habeas petition, and fairminded jurists could agree that such a denial is consistent with federal law as articulated in *Solem*, *Lockyer*, and *Rummel*.

**E. Sixth Amendment Claim Based on Denial of Self-Representation (Claim 18)**

In Claim 18, petitioner asserts his right to self-representation was violated when the trial court denied his request to represent himself at the sentencing hearing. Petitioner challenged the denial of his request for self-representation in a petition for writ of habeas corpus in California Supreme Court No. S232045. The California Supreme Court summarily denied the petition on April 13, 2016. Dkt. Nos. 70-8 at 2, 77 at 19. Based on the trial court record, the Court concludes that the California Supreme Court's denial of petitioner's claim was within constitutional bounds as established by the U.S. Supreme Court.

**1. Background to Petitioner's Claim**

Petitioner's trial concluded on November 1, 2012. With petitioner's consent, counsel waived rights to a speedy sentencing to allow for additional preparation. But petitioner asserts he had "no contact" with counsel throughout the month of November, such that he "could not help counsel prepare for the sentencing." Dkt. No. 45 at 27. At the sentencing hearing on November 30, 2012, petitioner asserted that he "would like to represent myself for sentencing." Dkt. No. 141-71 at 26 (hearing transcript); Dkt. No. 4-6 (motion). The trial court considered petitioner's request:

> **The Court**: and you will be ready December 26th?
> …
> **Petitioner**: Yes.
>
> **The Court**: What's your position on that, [petitioner's counsel]?
>
> **Petitioner's Counsel**: I resist that on the grounds – I have never felt the defendant was

34

competent, and you know that that's why we had an entire trial on the subject in this court, and the jury hung 10 to two for incompetence.
…
**The Court**: But the only doctor who ever saw your client and suggested at that late stage, after his first trip under 1368, the only medical person -- the medical person said, "if he has his meds, he should be fine." Soon thereafter, he had his meds, and you're still concerned about his competency.

**Petitioner**: My meds –

**Court Reporter**: I missed that because [petitioner] is talking over you.

**The Court**: -- said he's a malingerer and he fakes issues. I mention that only in the context, that's where all the medical people are.

**Petitioner's Counsel**: I have no objection to him representing himself if I can be appointed to be backup counsel. I do want to put in some documents at the time of sentencing and be present during that time; otherwise, I have no objection.

**The Court**: well, with this longer record of his actions, I'm -- I understand I'm supposed to evaluate this anew, this is something fresh. Now I'm giving everybody another month.

But in evaluating it anew, even today, he would not stop talking when he was told to stop talking. He's had extreme outbursts, in those extreme outbursts, he has literally chanted what would have to constitute contempt repeatedly.

He's had the same problems with court after court before he arrived in my court. It is difficult to expand the right of self-representation to include somebody who has been so purposely disruptive. He has continued that disruption even when he now says he's on his meds.

Beyond the disruption there have been, by the court's clear observation, a willingness to be totally dishonest, whether it goes back to his claim of, I can't be fair because we went to law school together, and we were in a physical fight against each other about a woman, or his representation in a motion where he wants it dismissed because he filed documents for a speedy trial and he never got it.

The court comes to the conclusion, it's dishonest, he never filed those documents, and he's representing he did now. Today I received a motion about why you are ineffective, which again and again misstates or abbreviates in such a way that it seems to misrepresent what's actually happened in this court concerning, for example, your actions or the court's rulings.

It would be difficult to come to the conclusion that Mr. Brown should be allowed to represent himself because of all of those things, and I am really willing to be expansive and extreme in letting him represent himself at this stage and have you remain -- appointed a standby counsel. But the reality is, he's just so beyond the pale.

Even by the expanded version I wouldn't give to any defendant, I can't have him included in that because of his own conduct. His motion to represent himself because of his actions, that would have to be denied.

35

Dkt. No. 141-71 at 263-265. The motion for self-representation was denied.

In the petition now before this Court, petitioner asserts the trial court erroneously denied his request for self-representation based on past "behavior *while he was refused proper medication*." Dkt. No. 156 at 69 (emphasis in original).  Petitioner asserts that on November 30, 2012—the date of his request—he was no longer denied medication, such that "reliance on evidence of his behavior pre-medication does not support the trial court's denial." *Id.*

### 2. Legal Standard

*Faretta v. California* established that criminal defendants have a "constitutional right to conduct [their] own defense."   422 U.S. 806, 836 (1975).   When defendants "clearly and unequivocally declare" that they want to represent themselves and do "not want counsel," the trial court ought to grant the request. *Id.* at 835.

But "the right of self-representation is not absolute." *Indiana v. Edwards*, 554 U.S. 164, 171 (2008).  The Court need only honor the request if (1) the defendant "knowingly and intelligently forgoes his right to counsel" and (2) the court is satisfied that the defendant is "able and willing to abide by rules of procedure and courtroom protocol." *McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984). *See, e.g.*, *Zamora v. Virga*, No. 12-CV-1922, 2013 WL 3788423, at \*10 (E.D. Cal. July 18, 2013), report and recommendation adopted, No. 12-CV-1922, 2013 WL 4647982 (E.D. Cal. Aug. 29, 2013) (denial of self-representation not unreasonable under AEDPA where "defendant's prior behavior has made clear that allowing him to represent himself would seriously disrupt the trial proceedings."); *Ainsworth v. Virga*, No. CV 10-6602, 2012 WL 7984098, at \*9 (C.D. Cal. Aug. 13, 2012), report and recommendation adopted, No. CV 10-6602, 2013 WL 1707918 (C.D. Cal. Apr. 19, 2013) (similarly denying AEDPA petition based on *Faretta* where defendant "engaged in numerous…obstructionist tactics"); *Bob-Ray v. Kelly*, No. 17-CV-01469, 2019 WL 7630940, at \*5 (D. Or. Dec. 18, 2019), report and recommendation adopted, No. 17-CV-01469, 2020 WL 363393 (D. Or. Jan. 22, 2020) (denying AEDPA petition based on *Faretta* claim where "(1) [defendant] did not understand the disclosures in the self-representation form, and (2) [defendant] was disruptive").

Because the California Supreme Court summarily denied petitioner's claim, AEDPA requires this Court to "determine what arguments or theories…could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

### 3. Discussion

Supreme Court precedent provides two independent bases for denying a petitioner's request for self-representation: either (1) the request is not made knowingly or intelligently, or (2) the court finds the petitioner unable or unwilling to comply with the court's procedure and protocol. *McKaskle,* 465 U.S. at 173.  Based on the trial court record, the California Supreme Court could have found that the trial court's denial of petitioner's request for self-representation was justified by petitioner's inability to comply with courtroom procedures and protocols.

Petitioner's assertion that the trial court relied solely on instances of petitioner's past, pre-medicated behavior is without merit.  The transcript demonstrates, for example, that even at the November 30, 2012 hearing where petitioner asserted his right to self-representation, he "would not stop talking when he was told to stop talking." Dkt. No. 141-71 at 264.  *See also*, *Id*. at 251 (earlier in the same hearing, after denying a separate request by petitioner for appointment of new trial counsel to argue a new trial motion, but before denying petitioner's *Faretta* motion: "Petitioner: Wow. For the appellate record, can you not be vague and address issues specifically, your honor. | The Court: Mr. Brown, you are again speaking out of turn. I gave you the chance to have anything you want. You don't get to argue with me about my ruling. Be quiet. | Petitioner: If you give me a chance to talk, I'm talking. | The Court: I'm not giving you a chance to talk, that's why I'm telling you to be quiet."); *Id*. at 252-53 (shortly after, in the same hearing: "The Court: Mr. Brown, I will remove you from the court while I make the record -- | Petitioner: because you don't want me to talk; right? | The Court: now just stop talking.").

The California Supreme Court could thus have concluded, based on the record excerpted above, that the trial court's denial of petitioner's self-representation motion was not based solely on

United States District Court
Northern District of California

pre-medication conduct, but was also based on petitioner's behavior in the minutes preceding the ruling on November 30, 2012, at which time petitioner concedes he was on medication. Further, the record suggests that medications may not have made much of a difference; at the November 30 hearing, the trial court observed petitioner "has continued that disruption even when he now says he's on his meds." *Id.* at 264.

Based on the record, this Court cannot hold that the California Supreme Court's denial of petitioner's appeal of the *Faretta* claim was outside constitutional bounds.

### F. Sixth Amendment Claim Based on Denial of *Marsden* Motions (Claim 12)

The exhausted portion of Claim 12 asserts the trial court's denial of a *Marsden* motion, filed after criminal proceedings resumed in mid-2012, denied petitioner his Sixth Amendment right to effective assistance of counsel. On direct appeal, the California Court of Appeal issued a reasoned decision affirming the trial court's denials of the motions.

Based on a careful review of the transcripts and applicable law, this Court cannot conclude that the California Court of Appeal decision entailed an objectively unreasonable application of federal law or an objectively unreasonable determination of the facts.

#### 1. Background to Petitioner's Claim

A jury's inability to reach a timely decision on petitioner's competency to stand trial led to a declaration of a mistrial in late 2011. Criminal proceedings were resumed in June 2012. Soon after the resumption of proceedings, petitioner began filing a series of *Marsden* motions in an attempt to dismiss his counsel, Mr. Du Bois, for allegedly ineffective assistance. Petitioner filed *Marsden* motions on July 20, October 10, October 16, October 23, and October 24, 2012. The *Marsden* motions asserted the following grounds for ineffectiveness:

1. Mr. Du Bois allowed the competency trial to proceed without petitioner present, Dkt. No. 141-72 at 11-12 (<u>filed under seal</u>)

2. Mr. Du Bois failed to object to the trial court's declaration of a mistrial and the dismissal of the jury empaneled for the initial 2011 criminal trial, *id.*;

3. Mr. Du Bois disclosed confidential communications to the trial court, prosecutor, and petitioner's family, Dkt. Nos. 141-74 at 8-9 (underline filed under seal), 141-75 at 10 (underline filed under seal);

4. Mr. Du Bois failed to heed petitioner's request to investigate or call certain witnesses, Dkt. Nos. 141-74 at 5 (underline filed under seal), 141-76 at 7-13 (underline filed under seal);

5. Mr. Du Bois failed to obtain independent testing of DNA evidence, Dkt. No. 141-76 at 12 (underline filed under seal).

The trial court considered petitioner's arguments and denied the *Marsden* motions. Petitioner then appealed these denials to the California Court of Appeal, which found that the trial court did not abuse its discretion in denying the *Marsden* motions:

> Defendant contends the trial court erred in denying his many motions for substitution of appointed counsel pursuant to *Marsden* made prior to and during the 2012 trial. In making the argument, defendant does not discuss the contents of any particular motion, much less demonstrate error in connection with any particular ruling. Instead, he argues the accumulation of motions demonstrated a breakdown in communication between client and attorney that required substitution of counsel.

> Defendant had requested appointment of his trial counsel, William Du Bois, by name when, in 2010, defendant chose to stop representing himself and moved for appointment of counsel. Du Bois continued to represent defendant through the suspended 2011 trial and the subsequent competency trial, but he was relieved following the declaration of a mistrial in that proceeding. Du Bois was reappointed after defendant was declared competent and criminal proceedings resumed after May 2012. Once prior to and repeatedly during trial, defendant made *Marsden* motions for substitution of new appointed counsel for Du Bois. We describe them briefly.

> *July 20, 2012*: Although acknowledging Du Bois was "a great attorney," defendant sought new counsel because Du Bois had not obtained a psychiatric evaluation of defendant prior to the September 2011 trial. In addition, defendant believed Du Bois, during the competency trial, had called as a witness a defense expert who had performed a "private evaluation" and improperly allowed a mistrial to be declared. The trial court denied the Marsden request, noting defendant had mischaracterized the events and finding, "Your counsel has been incredibly competent."

> *October 10, 2012*: During the trial, defendant contended he was not "getting a vigorous defense" because he did not have access to all his trial records in jail and witnesses he wanted to have called at trial were unavailable. Defendant was also concerned because Du Bois believed he was mentally ill and claimed Du Bois had revealed matters defendant had told him in confidence. Defense counsel denied having made any improper revelations.

He explained he and defendant had "tactical disagreements" because defendant insisted on a "nit-picky" approach to the evidence.

The trial court concluded defendant was taking inconsistent positions, leaving defense counsel "damned if he does and damned if he doesn't." Based on its own observations of counsel's performance at trial, the court denied the *Marsden* motion, concluding defendant did not understand defense counsel's tactics, which were based on a "better idea of the big picture" than defendant possessed. As the trial court noted: "There is a reality here that is all over the records, I don't think anybody could miss it, but you don't get along with any lawyers. . . . [¶] . . . [¶] . . . I gave you a second lawyer on whether or not you were competent, and it took you less than a week to start asking for Mr. Du Bois back. [¶] Now, the reality is, we could go through the entire Alameda County bar, I don't know if you would always be asking specifically for Mr. Du Bois back, but you would want to get rid of all of them."

*October 23, 2012*: Defendant contended Du Bois failed to locate or call several favorable witnesses, including witnesses who gave descriptions of the bank robber that did not match him. The trial court noted defense counsel had introduced evidence of the nonmatching descriptions through police reports and explained that calling the witnesses to testify risked the possibility they would recant those descriptions on the stand. The court concluded the testimony of the remaining witnesses was of little probative value. Du Bois acknowledged he failed to investigate the records of a particular hotel where defendant falsely claimed to have been working at the time of one robbery, but counsel explained defendant had not raised the issue with him prior to testifying. The trial court concluded Du Bois could not be held responsible for failing to warn defendant about the potential for impeachment of his false testimony when defendant had not told Du Bois in advance about the testimony. Defendant also faulted counsel for not challenging the prosecution's DNA evidence, but counsel explained there was no reason to doubt the DNA evidence, and investigating the work independently and confirming its accuracy would have strengthened the prosecution's position. As counsel explained: "It underlines the problem in favor of the Prosecution rather than derogates from it. . . . [I]f I thought there was the slightest problem, having reviewed [the prosecution's analysis], I would have had it reanalyzed." For the reasons discussed, the trial court rejected defendant's claims in denying the *Marsden* motion.

*October 24, 2012*: The next day, defendant filed a *Marsden* motion on the ground the trial court had referred to him as a liar in ruling on the prior day's *Marsden* motion. The trial court concluded defendant's points were the same ones rejected the prior day in connection with investigation and denied the motion.

*October 30, 2012*: During jury deliberations, defendant made a final *Marsden* motion, contending he had been the victim of "gross ineffectiveness." Defendant again contended Du Bois had failed adequately to investigate his case and contact favorable witnesses known to defendant. Defense counsel rebutted defendant's claims, noting defendant's inconsistencies in his account of the events had made it impossible to satisfy all his demands. Du Bois explained at length that the defense had pursued the many witnesses suggested by defendant and found their potential testimony unhelpful, contrary to defendant's expectations. In denying the motion, the trial court found defendant was unable to specify any particular witnesses who had not been contacted and judged his claims to be inconsistent and repetitive.

…

Claiming an "irreconcilable conflict," defendant contends the quantity of his *Marsden* motions, combined with counsel's earlier requests for relief from the representation, demonstrate he and Du Bois had a "breakdown in the attorney-client relationship." While the sheer number of *Marsden* motions illustrates defendant's level of frustration with the progress of his trial, it proves little about the nature of the relationship between defendant and Du Bois. As the transcripts of the several hearings demonstrate, counsel attempted to work with defendant, within the constraints permitted by defendant's erratic behavior, to provide the best available defense. In the face of a very difficult task, Du Bois appears, for the most part, to have maintained a remarkably reasoned perspective and a professional approach. Defendant, in turn, expressed admiration for counsel's skills and performance, inconsistently combined with his repeated criticisms. His frustration arose not from any personal conflict with counsel but from counsel's inability to meet his demands—demands that, the trial court found, were impossible to meet because they were erratic, inconsistent, and based on wishful thinking or outright invention. As the trial court also found, providing new counsel to defendant would not have resulted in an improved attorney-client relationship because defendant projected his frustration with his predicament onto any counsel appointed, leading to the identical dissatisfaction.

In short, while there was plainly a strained relationship between defendant and Du Bois, it was not the type of conflict that risked causing ineffective assistance of counsel. It was defendant's uncooperative and self-defeating conduct, rather than anything inherent in the relationship between defendant and Du Bois, that created a risk of error at trial, if such a risk existed. This conduct would have made the task of representation equally difficult for any attorney assigned to replace Du Bois. As a result, the trial court did not abuse its discretion in declining to replace Du Bois, despite their difficult relationship.

Dkt. No. 141-81 at 11-15 (footnotes omitted). In his petition before this Court, petitioner asserts that the California Court of Appeal was objectively unreasonable in finding his right to counsel was not violated by the allegedly deficient performance of Mr. Du Bois or by the alleged "irreconcilable conflict" that arose between himself and Mr. Du Bois.

**2. Legal Standard**

The Sixth Amendment guarantees criminal defendants "reasonably effective assistance" of counsel throughout the criminal proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). While the Sixth Amendment may "comprehend[]" a defendant's right to select and be represented by "one's preferred attorney," the "essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be

41

represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Accordingly, a defendant's claim of ineffective assistance of counsel must be predicated on a showing that "counsel's representation fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, not merely that defendant disagreed with counsel's approach to the case. *See Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) ("[N]ot every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights").

In California, a criminal defendant wishing to alert the court of perceived deficiencies in counsel's ongoing performance may submit a *Marsden* motion. *People v. Marsden*, 2 Cal.3d 118, 126 (1970); *see also Robinson v. Kramer*, 588 F.3d 1212, 1215 n. 2 (9th Cir. 2009) (discussing *Marsden*). When such a motion is submitted, "'the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance.'" *People v. Taylor*, 48 Cal.4th 574, 599 (2010) (quoting *People v. Smith*, 30 Cal.4th 581, 604 (2003)). "A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." *Id.* *See also People v. Hines*, 15 Cal.4th 997, 1025 (1997) (holding that a *Marsden* motion should only be granted when the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation.").

The California Court of Appeal was the last state court to adjudicate petitioner's claim on the merits and issued a reasoned opinion. Thus, relief is only warranted under section 2254(d)(1) if the California Court of Appeal reached "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This Court's task is not to determine whether the state court correctly followed the *Marsden* procedures. Rather, the Court must determine whether the California Court of Appeal's denial of the *Marsden* motions was consistent with the Sixth Amendment's right to counsel.

**3. Discussion**

The Court is unable to conclude that the California Court of Appeal unreasonably applied federal law or reached a decision that was contrary to clearly established federal law.  The court addressed petitioner's two theories in turn: first, whether the Court of Appeal was unreasonable in finding Mr. Du Bois' assistance not ineffective, and second, whether the Court of Appeal was unreasonable in finding that the alleged "irreconcilable conflict" did not deprive petitioner of his right to counsel.

First, the California Court of Appeal addressed petitioner's ineffective assistance of counsel claims one by one and reasonably concluded that Mr. Du Bois was not rendering ineffective assistance so as to require dismissal.  The trial court record supports these determinations:

1. Petitioner's absence from the competency proceedings in December 2011 was not the result of ineffective assistance, but petitioner's own misconduct.  Dkt. No. 141-72 at 14 (filed under seal) (court telling petitioner, regarding the December 2011 hearings, "[y]ou are aware that you repeatedly absented yourself from the record by gross and inappropriate conduct.")

2. Mr. Du Bois himself called for a mistrial in the 2011 criminal proceedings following several weeks of deadlock in the competency trial.  Dkt. No. 141-16 at 253-54.  His failure to object to the entry of mistrial and dismissal of the jury was consistent with this tactical decision.

3. Mr. Du Bois disclosed only what was necessary to investigate certain information provided to him by petitioner.  Dkt. No. 141-74 at 10-11 (filed under seal); *Id*. at 11 (court remarking "[i]t sounds like the defendant might think on the one hand you should be investigating it, and on the other, you're letting out things he's talked to you about… Mr. Du Bois is damned if he does and damned if he doesn't.").

4. Mr. Du Bois honored petitioner's request to investigate and attempt to call certain witnesses.  Dkt. No. 141-77 at 11-12 (filed under seal) ("We've attempted to reach every witness to whom we have been directed, and been met by hostility from a number of them refusing either to cooperate or come and testify, not the least of which is Todd Shaw [i.e., "Too Short"], whom the defendant sued while these proceedings were pending."); Dkt. No. 141-78 at 30-31 (filed under seal) ("We went to every witness that he asked us to after he testified, and there was a rebuttal by the

prosecution, every one he asked us to, we contacted. And they all had a similar response to the witness who we called … they were extremely hostile towards him.").

5. Mr. Du Bois reviewed the bench notes of the DNA analysis and concluded independent analysis was unwarranted and might be counterproductive.  Dkt. No. 141-76 at 15-16 (underlined filed under seal) ("I didn't find any reason to reanalyze the DNA. But it wasn't for lack of review of that material, a very careful review of it. And I discussed all these issues, by the way, ad nauseam with the client.").

In his Traverse, petitioner further emphasizes Mr. Du Bois' alleged failure to investigate witnesses, in particular, witnesses that could have "corroborated" petitioner's alibi that he was at the Four Seasons on the night of the January 2007 robbery.  Dkt. No. 156 at 48.  This Court addresses this specific contention in greater detail in Claim 22, *infra* Section H.3.b, where it finds the California Court of Appeal's determination that Mr. Du Bois' performance was not deficient is consistent with *Strickland*.  Thus, based on the foregoing, this Court cannot conclude that the California Court of Appeal unreasonably applied federal law in finding the trial court's denial of petitioner's *Marsden* motion justified, and therefore, consistent with the Sixth Amendment.

Second, while the record does indicate that petitioner and Mr. Du Bois had a strained relationship, the Court cannot conclude that this alleged "irreconcilable conflict" rose to the level of a constructive denial of counsel or led to actual prejudice.  The record indicates that Mr. Du Bois worked diligently to afford petitioner adequate representation.  In his own words:

> This is one of the most difficult trials that I have ever had in all my 40 years of practice, in my 36 years of defense practice, because the client is virtually impossible to work with.
>
> And I don't fault him for that. It's not his fault that he has a mental defect, which causes him to be like this. It is no surprise to me that he has had a number of lawyers in the past, and I understand the court's position on not allowing me to withdraw.
>
> I've rarely been in this situation. I've never moved, for example, before, a half a dozen times to withdraw as I have in this case.
>
> We are having tactical disagreements. That doesn't reveal any confidences whatsoever by saying, "we're having tactical disagreements," but we're having them, to the extreme.

I will finish this trial, because I'm under a court order to do so, but it is a very difficult thing to work under the circumstances. I believe that the client has become self-destructive, from my observations. That he has no capability to understand the implications with the jury of what his nit-picky approaches to the evidence will have, and whereas I believe he has a good chance on some of these cases, the Hayward cases, although the fact that his apparent co-responsible in Fremont says the bank photograph is of him, certainly hurt us I.D. wise.

We intend to show that the percipient witnesses are not reliable identity-wise in that case, but he could do well. But if he continues to assert these nit-picky facts, such as I outlined before with respect to Detective Northrup, in front of the jury, he will, in my opinion, so negatively impact them that he doesn't have a chance of a snowball of avoiding conviction as charged on all counts. And that's what's difficult about representing him.

It's been hard for me to get that point across, because he doesn't understand the point to start with. He doesn't understand the negative impact that the type of thing he does in his many motions and his 850 grievances with the sheriff's department, they may have some traction with the appellate courts or with the sheriff's department complaint department, but it has no traction with the jury.

In fact, if anything, it has negative impact, and that's why I say he's become self-destructive is, if I were to do everything he suggests, I would sew up this case against him, and I will submit the matter on that basis that -- with the conclusion that it is very difficult under circumstances where your client doesn't appreciate the large picture, the larger picture, or the danger that he is in, but is more focused on minor details, which have little or no bearing on the merits, but asserting them in front of the jury is bound to have a negative impact. And that's the position I'm in.

Dkt. No. 141-74 at 12-14 (October 10, 2012) (underlined under seal).  As referenced above, Mr. Du Bois himself filed several motions to withdraw, declaring that there were irreconcilable differences, an immediate breakdown in the attorney client relationship, and that he was unable to effectively assist as counsel.  Dkt. No. 4-7 (petitions).

However, the record suggests a new appointment would have made little difference. Mr. Du Bois was petitioner's fifth appointed attorney, following Deputy Public Defender James Mann, private counsel Patrick Hetrick, private counsel Darryl Stallworth, and private counsel Gary Sherrer. Not infrequently, the trial court remarked on petitioner's inability to forge a productive relationship with *any* attorney.  *See* Dkt. No. 141-72 at 9-10 (underlined under seal) (observing that petitioner "will be displeased with anybody if it stalls the case further . . . as soon as there is somebody else in the chair, he wants that person back"); Dkt. No. 141-75 at 11 (underlined under seal) ("We could give you lawyers

45

until hell freezes over. You would find reasons not to want all of them."); Dkt. No. 141-78 at 32 (underlined: filed under seal) (court telling Mr. Du Bois: "Nobody is going to do any better dealing with the defendant than you.").

While a *Marsden* motion ought to be granted when defendants and their counsel are "embroiled in such an irreconcilable conflict that ineffective representation is likely to result," *Taylor*, 48 Cal.4th at 599, federal law does not grant a criminal defendant who is unable to work with *any* attorney an unlimited right of redress. Because a defendant cannot be prejudiced by an irreconcilable conflict with counsel if that conflict would arise *no matter who* is appointed to represent him, such a claim fails under the Sixth Amendment. Thus, the California Court of Appeal decision was not contrary to or an unreasonable application of federal law.

### G. Due Process Claim Based on Prosecutorial Misconduct (Claim 14)

In Claim 14, petitioner asserts that the prosecution violated his Fourteenth Amendment right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963) when it failed to disclose facts pertaining to prosecution witness Samuel Bryant, and under *Napue v. People of State of Ill.*, 360 U.S. 264 (1959), when it failed to correct allegedly false testimony presented by Bryant at trial. Petitioner presented both claims in a writ of habeas corpus to the California Supreme Court, which summarily denied the writ on April 13, 2016. Based on a careful review of the trial court record and applicable law, the Court concludes that fairminded jurists would agree that the arguments and theories which could have supported the California Supreme Court's summary denial would not run contrary to federal law as articulated by the U.S. Supreme Court.

#### 1. Background to Petitioner's Claim

Samuel Bryant knew petitioner for approximately seven years before he took the stand in

United States District Court
Northern District of California

October 2012. Dkt. No. 141-65 at 31.  At that time, Bryant was incarcerated for a bank robbery committed on February 7, 2007.  *Id*. at 26-28, 32-33.  Bryant pled guilty to that robbery in fall 2007 and indicated at trial that he was not "cut any deals" or "cut any breaks" for testifying at petitioner's trial five years later.  *Id*. at 28-29.

While on the stand, the prosecution asked Bryant: "Back on August 14, 2006, did you commit a robbery at the Patelco Credit Union in Fremont with the defendant?"  *Id*. at 37.  Bryant answered yes.  The prosecution then inquired into what happened in 2006, after that Fremont robbery:

**Prosecution**: Now, Mr. Bryant, when the Fremont Police Department talked to you for the very first time, you told them that you weren't there, right? You told them that you weren't at this Fremont Patelco; is that right?

**Bryant**: Yep.

**Prosecution**: In fact, you said that the defendant did it with somebody else, right?

**Bryant**: [Nods head.] Yeah.

**Prosecution**: Why'd you say that?

**Bryant**: So I don't get in trouble.

*Id*. at 39.  Bryant's story to police changed on February 7, 2007.  That day, Bryant was arrested exiting a bank he had just robbed in Hayward, California.  *Id*. at 32.  Bryant testified that petitioner was waiting outside in a getaway car.  *Id*. at 33.  Following his arrest on February 7, the state informed Bryant that investigators found his DNA at the site of the 2006 Patelco Credit Union robbery in Fremont.  *Id*. at 39.  This led Bryant to confess to that he and petitioner committed the 2006 Fremont robbery.  *Id*.

Petitioner's present claim is based on revelations he allegedly obtained after trial concluded. Petitioner submits that after trial, he learned that, while being investigated, Bryant admitted to authorities that he was involved in another robbery on May 30, 2006 but was never prosecuted for that crime.  Petitioner believes Bryant's admission forms the basis for two due process violations.

47

First, petitioner argues the prosecution's failure to disclose Bryant's admission and the fact that he was not prosecuted constitutes withholding favorable and material evidence from the defense. Second, petitioner argues that the prosecution presented "false" testimony when it permitted Bryant to testify "he had only been involved in two rather than three robberies...[and] did not correct this testimony."

### 2. Legal Standards

*Brady v. Maryland* holds that the prosecution violates a defendant's due process rights when it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment.  373 U.S. 83, 87 (1963).  Favorable evidence may include, among other things, impeachment evidence or exculpatory evidence.  *Shelton v. Marshall*, 796 F.3d 1075, 1084 (9th Cir. 2015), *amended on reh'g*, 806 F.3d 1011 (9th Cir. 2015) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).  "[E]vidence is 'material' under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different."  *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995).

The prosecution's knowing use of "false evidence" to obtain a conviction similarly infringes on a defendant's due process rights.  *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959).  "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Id.*; *Giglio v. United Sta*tes, 405 U.S. 150, 153 (1972) ("[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'").  When a conviction is "obtained by the knowing use" of such testimony, the verdict "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Because the California Supreme Court summarily denied petitioner's claims, this Court must consult the above-cited authorities to "determine what arguments or theories supported or, as here,

could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

### 3. Discussion

#### a. *Napue* claim.

Petitioner argues the prosecution allowed Bryant to testify that he was *only ever* involved in two robberies—not more, not less. This omission, petitioner argues, impacted the jury's assessment of Bryant's credibility as a witness. *Napue*, 360 U.S. at 269. The trial transcripts, however, could have permitted the California Supreme Court to conclude—and fairminded jurists to agree—that such an omission had no "effect on the outcome of the trial." *Id.* at 272.

Bryant's credibility was called into question when the jury learned that he lied to police while initially being questioned in 2006, before being subsequently confronted with DNA evidence inculpating him in the Fremont robbery. Bryant's credibility was further undermined—and his criminal history emphasized—when petitioner's counsel asked:

> **Petitioner's Counsel**: And isn't it true that you committed 25 different robberies throughout the Bay Area?
>
> **Bryant**: No.
>
> **Petitioner's Counsel**: And isn't it true that you committed robberies in Hayward, Oakland, Alameda, Berkeley, San Ramon, Dublin, Fremont and Sacramento, as well as other cities?
>
> **Bryant**: No.

Dkt. No. 141-65 at 49. Contrast Bryant's answers during petitioner's cross examination to the testimony offered by the detective who interviewed Bryant in 2007:

> **Petitioner's Counsel**: Isn't it true that Bryant lied to you on numerous occasions during his interview with you?
>
> **Officer**: I believe he did, yes.

49

**Petitioner's Counsel**: Could you just give us a couple of examples to shorten the examination.

**Officer**: The number of times he was involved with the defendant robbing banks, that was probably the biggest one.

**Petitioner's Counsel**: Yeah, he said there were bank robberies all over, right, tons of them?

**Officer**: No. initially he said he had only been involved in the one robbery in alameda, and he had never been involved in any others, and then recanted that later.

**Petitioner's Counsel**: And then, of course, he said he wasn't involved in the Fremont robbery; right?

**Officer**: Well, we went from him just being involved in the Alameda robbery, which he was compelled to do at gunpoint by [petitioner], to him saying that he had been involved in a number of other robberies with [petitioner] at different locations.

**Petitioner's Counsel**: And you thought he was telling you the truth when he said he was compelled to do the Alameda robbery at gunpoint, but he had done the other ones voluntarly? … And then he initially lied to you about whether he was involved at all in the robbery in Fremont; right?

**Officer**: I can't go case by case, I don't have that type of recall, but what I am stating is that he said initially he was only ever involved in one bank robbery, and that was the one in Alameda where he was caught by Alameda P.D. Later, two and a half hours later in the interview, we went from that point to him saying, "I've been involved in bank robberies in San Ramon, Danville, Hayward. I've been involved in robberies of Starbucks, other businesses, working in conjunction with [petitioner]," and then describing in detail how they formulated these robberies.

**Petitioner's Counsel**: 25, he said 25 separate robberies; right?

**Officer**: I didn't count them off, sir, but I think I put in my report as many as 25 different robberies.

Dkt. No. 141-66 at 253-54.  During trial, Bryant denied making such statements to detectives. Dkt. No. 141-65 at 49-50.   However, given the competing detective's testimony and petitioner's counsel's own impeachment of Bryant, the California Supreme Court could have concluded that the prosecution's failure to specify that Brant was not *only* involved in two robberies was unlikely to marginally affect "the judgment of the jury." *Agurs*, 427 U.S. at 103.  Petitioner has not established that no fairminded jurist could agree that such a holding would be inconsistent with *Napue*.

1

2          **b. *Brady* claim.**

3          Petitioner's *Brady* claim based on the May 2006 robbery fails for similar reasons. As

4   petitioner views it, the fact that the prosecution knew of Bryant's admission of the May 30, 2006

5   robbery and failed to prosecute Bryant for the crime "suggests he was granted leniency in exchange

6   for his testimony against [petitioner]." Dkt. No. 45 at 46.  The record, however, does not support

7   petitioner's contention that there was such an undisclosed deal.  And respondent concedes that—

8   had such a deal in fact been reached—*Brady* would have mandated disclosure.  Dkt. No. 144-4 at

9   90 (<u>filed under seal</u>).

10         Further, assuming there was a failure to disclose,[4]  evidence of the May 2006 robbery itself

11  would have been "merely cumulative of other evidence" as to not be material under *Brady*. *Williams*

12  *v. Woodford*, 384 F.3d 567, 599 (9th Cir. 2004) (describing nondisclosure of cumulative evidence

13  as harmless error).  As discussed above, evidence was introduced that Bryant may have been

14  involved in as many as 25 other robberies.  The California Supreme Court could have concluded

15  that the specification of one additional robbery was unlikely to raise a "reasonable probability" of a

16  different result at trial.  *Wood*, 516 U.S. at 5.  This Court concludes that fairminded jurists could

17  agree that such an application of *Brady* is consistent with Supreme Court precedent.

18

19  **H. Sixth Amendment Claim Based on Ineffective Assistance of Trial Counsel (Claim 22)**

20

21         Petitioner's Claim 22 asserts that trial counsel's ineffective assistance deprived him of his

22  Sixth Amendment rights to counsel. Based on the record below, the Court cannot conclude that

23  petitioner is entitled to relief based an unreasonable application of on *Strickland v. Washington*, 466

24

25  _____

26         [4] Respondent asserts the prosecution timely disclosed all interview reports and transcripts.
    Dkt. No. 144-4 at 88 (<u>filed under seal</u>).

U.S. 668 (1984).

### 1. Background to Petitioner's Claims

The Second Amended Petition emphasizes three grounds for finding that petitioner's right to counsel under the Sixth Amendment was violated.  First, petitioner argues that his trial counsel, Mr. Du Bois, erroneously advised him that accepting the government's plea deal would require him to give up "all rights to appeal."  Dkt. No. 115-1 at 15.  Petitioner submits that, had counsel properly informed him that some claims were nonwaivable, he would not have rejected the deal.  Petitioner raised the claim in a petition for writ of habeas corpus before the California Supreme Court on December 6, 2018.  Dkt. No. 117-13 at 2.  Relief was summarily denied.

Second, petitioner argues that Mr. Du Bois failed to investigate petitioner's Four Seasons alibi until it was too late to mount an effective defense against the government's impeachment witness.  Dkt. No. 115-1 at 17.  Petitioner raised counsel's alleged failure to investigate witnesses on direct review before the California Court of Appeal.  Dkt. No. 141-80 at 49-50.  The California Court of Appeal rejected the claim in a reasoned opinion issued April 28, 2015.  Dkt. No. 141-81 at 16-17.

Third, petitioner argues that he was denied his right to counsel when the trial court refused to allow him and Mr. Du Bois to part ways due to an "irreconcilable conflict."  Dkt. No. 115-1 at 19.  This claim is different from the one petitioner raised in Claim 12 pertaining to the denial of his *Marsden* motions.  Here, petitioner argues that jail's denial of medication rendered him incapable of assisting his attorney, ultimately leading to an irreconcilable conflict. Petitioner raised this claim on habeas corpus before the California Supreme Court, Dkt. No. 117-6 at 5-7, which summarily denied relief.

### 2. Legal Standard

To prevail on an ineffective assistance of counsel claim, a petitioner must establish that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that the result of the proceeding would have been different had counsel's performance not been deficient. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The objective reasonableness of counsel's performance is measured by "prevailing professional norms" existing at the time. *Id*. at 688; *Carrera v. Ayers*, 670 F.3d 938, 941 n.3 (9th Cir. 2011).

When considering a *Strickland* claim in an AEDPA petition, as the Court must do here, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. "This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Id*. Review of a state court's denial of an ineffective assistance claim under AEDPA is thus "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009), requiring the Court to consider the substantial "range of reasonable applications" of the "general" *Strickland* standard. *Harrington*, 562 U.S. at 105.

When, as is the case for the claims based on trial counsel's alleged failure to investigate, the California Court of Appeal "explains its decision on the merits in a reasoned opinion," this court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson*, 138 S. Ct. at 1192. For the ineffective claims which were presented to the state court and adjudicated summarily without a reasoned lower court opinion, the Court will consider which arguments and theories "could have supported" the California Supreme Court's summary denials, *Harrington*, 562 U.S. at 102, and then consider whether petitioner has established that no fairminded jurist could conclude that such an adjudication is consistent with federal law as articulated by the Supreme Court. *Id*.

### 3. Discussion

#### a. Counsel's Appeal-Waiver Advice

Before trial, the prosecution offered petitioner a sentence of twenty-two years if petitioner would agree to waive all of his appeal rights. Dkt. No. 141-63 at 70-71, 178-79, 221. Petitioner asserted that he preferred a deal that would give him a slightly longer sentence but would allow him to pursue a speedy trial claim on appeal. *Id.* at 221; Dkt. No. 141-66 at 124. Petitioner's trial counsel, Mr. Du Bois, advised petitioner to accept the prosecution's offer of 22 years with an appeal waiver. Dkt. No. 141-63 at 222. Petitioner rejected the prosecution's offer. *Id.* at 223.

In the Second Amended Petition, the petitioner asserts that he "would have accepted the plea bargain of 22 years, had trial counsel not erroneously advised him that he would give up all rights to appeal." Dkt. No. 115-1 at 15. Counsel's advice was objectively unreasonable under *Strickland*, petitioner argues, because certain claims will remain non-waivable even in light of an appeal waiver, including, for example, his double jeopardy claim (*see* Claim 7, *supra* Section III.B). Dkt. No. 156 at 43 (citing *Halbert v. Michigan*, 545 U.S. 605, 621 (2005)). *See Garza v. Idaho*, 139 S. Ct. 738, 744 (2019) (noting that the term "appeal waivers" in plea deals "can misleadingly suggest a monolithic end to all appellate rights … , [but] no appeal waiver serves as an absolute bar to all appellate claims.").

Petitioner's Traverse emphasizes that the "defective advice" was "not that Petitioner would have to give up his speedy trial claim, but that Petitioner would waive his right to appeal *all* claims." Dkt. No. 156 at 43 (emphasis in original). Had Mr. Du Bois advised him properly on the operation of appeal waivers, petitioner argues, there is a "reasonable probability" he would have accepted the 22-year plea deal.

Based on a careful review of the record, the Court concludes that the California Supreme Court could have found that petitioner's claim fails for lack of prejudice. Despite petitioner's *post hoc* emphasis on Mr. Du Bois' advice that petitioner would waive "his right to appeal *all* claims,"

54

the record indicates that petitioner viewed only the ability to retain appeal rights over the speedy trial claim as dispositive in whether he would accept the government's offer. *See* Dkt. No. 141-63 at 22 ("Mr. DuBois: Right. So as to the two, I recommend that he select one of those two, and he agreed to plead to the offer of 24 years if he was allowed to certify the issue of speedy trial."); *Id*. at 223 ("Mr. DuBois: …[T]he record should reflect… I've recommended a disposition to the defendant, which he has accepted, in part, and rejected, in part. He accepted the 24 with a Certificate of probable cause on the issue of speedy trial. He rejected, outright, the 22, and waive [sic] his appellate rights.").  The petition for review, drafted by *pro se* petitioner himself, further indicates the centrality of the speedy trial claim in driving petitioner to reject the plea deal. Petitioner wrote:

> Trial counsel failed to advise petitioner he would have been able to still present his federal constitutional speedy trial claim (and other constitutional claims rendering state unable to prosecute him) on direct appeal.

> Trial counsel warned petitioner if he took deal that he forfeits his speedy trial et al claims.

Dkt. No. 117-13 at 6.  However, Mr. Du Bois' advice on the waiver of the speedy trial claim was not unreasonable. *See People v. Egbert*, 59 Cal. App. 4th 503, 508 (1997) (observing "[c]ourts have consistently held a guilty plea waives appeal of a speedy trial claim, either constitutional or statutory, in felony prosecutions"); *Ortberg v. Moody*, 961 F.2d 135, 137–38 (9th Cir. 1992) (observing that a speedy trial claim does not "challenge the authority of the state to hale Petitioner into court," and therefore does not survive a guilty plea).

Thus, petitioner attempts to locate the deficiency in Mr. Du Bois' advice that an appeal waiver would waive "all" claims.  But even assuming such advice was defective, the California Supreme Court could have reasonably concluded, based on the record, that petitioner *would have still* rejected the plea deal even if Mr. Du Bois correctly informed him of his right to appeal the non-waivable double jeopardy claims or ineffective assistance of counsel claims.  Thus, the California Supreme Court could have found—and fairminded jurists could agree—that petitioner's claim based

on counsel's appeal waiver advice failed to establish a "reasonable probability" of a different outcome.

### b. Counsel's Investigation.

Petitioner testified at trial on October 23, 2012.  While on the stand, he testified to his whereabouts on January 26, 2007, when one of the charged robberies took place.  In the Second Amended Petition, petitioner asserts that Mr. Du Bois was woefully unprepared for the cross-examination that followed.

Petitioner testified that on the evening of January 26, 2007, he attended a group dinner at The Cheesecake Factory before heading to "parties that night, two of them." Dkt. No. 141-70 at 11. The first of those parties, petitioner testified, took place at the Four Seasons Hotel in Palo Alto, California.  *Id*. at 20-21.  Petitioner stated that he helped organize, promote, and run the party.  *Id*. at 1173-74.  In particular, he testified he was responsible for recruiting music artists and getting them to the party "on time."  *Id*.  As petitioner described it, the party at the Four Seasons was held for "Sweet Sixteen," featured "a thousand or less" guests, was "really outrageous," and featured several leading Bay Area hip hop artists, including "Too Short." *Id*. at 22-25.

The court then recessed for lunch.  During that time, Mr. Du Bois learned that the prosecution intended to call a Four Seasons employee in to testify as an impeachment witness later that day. Outside the presence of the jury, Mr. Du Bois informed the court: "neither the investigator who is present in court now nor I recall the defendant having the relationship to that specific [Four Seasons] hotel in our conversations."  *Id*. at 83.  He continued:

> Counsel for the government points out that there was some reference to it during testimony on the speedy trial motion earlier in this court. In our communications the emphasis by the client was on The Cheesecake Factory meeting and requested that we seek to verify that. But never before have we focused our attention on the Four Seasons. Now, if that means that I missed something, that I am ineffectively assisting the client, then that's what that means. But I never got it in a format that it was delivered to this jury until today and yesterday. So we haven't had a chance to check it out yet, and we would like to have a little time, very

56

little, but some time to do that.

*Id.* at 83.  The trial court denied Mr. Du Bois' request for more time to prepare for the government's planned impeachment testimony, remarking: "Counsel, you are too hard on yourself somehow suggesting you would anticipate this problem… Your client has been able to talk to you for some time about things to check out…But he makes things up. He has done so in the past." *Id.* at 85.

The prosecution then brought in Tracey Weise, who had worked as the Director of Human Resources at the Four Seasons Hotel in Palo Alto since 2005. *Id.* at 99.  She testified that, on the evening of January 26, 2007, she was responsible for holding an annual employee holiday party, which took place onsite in the ballroom—the "biggest event room in the Four Seasons." *Id.* at 100. Weise testified that she was present the entire night and did not believe the employee holiday party (or any other party on the premises) hosted a live hip-hop artist. *Id.* at 101.  The prosecution also introduced a screen shot of a computer system that showed all functions and events scheduled at the Four Seasons for January 26, 2007. *Id.* at 104-05.  Weise confirmed, based on the screen shot, that the only events at the Four Seasons that night were the holiday party and an employee computer training. *Id.* at 105.

The court held a *Marsden* hearing the following day, on October 24, 2012, arising from petitioner's claim that Mr. Du Bois had failed to prepare for impeachment.  At that hearing, Mr. Du Bois told the trial court:

> We've attempted to reach every witness to whom we have been directed, and been met by hostility from a number of them refusing either to cooperate or come and testify, not the least of which is Todd Shaw [i.e., "Too Short"], whom the defendant sued while these proceedings were pending.
>
> Additionally – and this is the part that I have persistently indicated as a result of the defendant's incompetence, and that is, we were never pointed to there being an issue about the Four Seasons or even the existence of the Four Seasons as being a place where the defendant's presence ought to be verified.
>
> Without going into attorney/client privilege information, I will just say that the Four Seasons was only mentioned by the defendant in terms which described it as incidental and not material to his alibi, up until it became a real issue during his testimony and the

57

prosecution's rebuttal.

> Even now that we have -- even though we have rested, my investigator is trying to find any conceivable corroboration he can to the defendant's suggestion that he had a business arrangement with the Four Seasons, or any hotel within a 20-mile radius of the Four Seasons on the day of this event. And if we do find some information, in that regard, we will bring it to the court's attention.

Dkt. No. 141-77 at 11-12 (underlined filed under seal).  The trial court denied the *Marsden* motion, concluding

that Mr. Du Bois could not be faulted for not anticipating for the unexpected testimony.  Another

*Marsden* hearing was held on October 30, 2012.  There, Mr. Du Bois updated the trial court on the

status of the investigation:

> **Mr. Du Bois**: We went to every witness that he asked us to after he testified, and there was a rebuttal by the prosecution, every one he asked us to, we contacted. And they all had a similar response to the witness who we called … they were extremely hostile towards him.

> **The Court**: And according to him, you're still supposed to just drag them in. That doesn't matter because—

> **Mr. Du Bois**: We will not call hostile witnesses. There are witness [sic]·who are absolutely hostile, one of which was this Mind Motion. Mind Motion, M-i-n-d, M-o-t-i-o-n. [The defense investigator] talked to the radio station, and they talked to Mind Motion, and Mind Motion was tremendously hostile and noncooperative and said he had no recollection, no records which went back that far. So, it's not that we haven't contacted people.

> When told something that made sense by the client, we have contacted the people and often, as with Dr. Cain, even though we contacted him, they had nothing constructive to add. But we have not been lacking in diligence, and the information in these boxes isn't going to help. I've reviewed all that stuff, and it—as I say, it's a good example, he's filed it even in the court, saying, oh, he had this information, it was only reviewed—if he would only reviewed the boxes he would have seen it, and had I done so, which I did, I would have seen Too Short, Todd Shaw, a.k.a. Too Short, had two shows September 26th, 2008, E-40, Palo Alto, Four Seas (as said), Hoodstarz, 4:30. Nothing to do with this case.

Dkt. No. 141-78 at 30-31 (underlined filed under seal).  Petitioner went on to appeal the trial court's refusal to

find Mr. Du Bois' performance deficient for purposes of a *Marsden* motion.  The California Court

of Appeal affirmed, finding that Mr. Du Bois "could not be held responsible for failing to warn

defendant about the potential for impeachment of his false testimony when defendant had not told

Du Bois in advance about the testimony."  Dkt. No. 141-81 at 13, 16.

In the Traverse, petitioner notes that Weise's Four Seasons testimony "provided damaging testimony and evidence that the party featuring Too Short never happened at their hotel that evening, thus impeaching [petitioner's] credibility and undermining his entire alibi." Dkt. No. 156 at 38. Petitioner thus asks this Court to (1) find that the California Court of Appeal unreasonably applied *Strickland* when evaluating Mr. Du Bois' performance, and/or (2) find the California Court of Appeal arrived at an unreasonable determination of the facts when it held that Mr. Du Bois could not be faulted for not anticipating petitioner's Four Seasons testimony.

The Court cannot find, however, that the California Court of Appeal's decision unreasonably applied *Strickland* or unreasonably determined the facts. First, Mr. Du Bois' investigation—despite being conducted much later than is ideal in a criminal proceeding—was met with hostile witnesses, a lack of corroboration, and empty leads. Even if one were to assume Mr. Du Bois performed unreasonably by waiting until after the government's impeachment to follow up with potentially corroborating witnesses, the fruitlessness of the investigation indicates that petitioner was not prejudiced by the error. The California Court of Appeal was thus objectively reasonable in concluding that petitioner's failure to demonstrate prejudice was fatal to his claim. Dkt. No.141-82 at 17. *Strickland* instructs that for an error to be prejudicial, "the likelihood of a different result must be substantial, not just conceivable." *Harrington,* 562 U.S. at 112. Here, given the results of Mr. Du Bois' investigation and the testimony presented by Four Seasons employee with direct first-hand knowledge of the hotel's events on January 26, 2007, the Court cannot conclude that *Strickland's* standard was unreasonably applied when the California Court of Appeal concluded that prejudice was required and unproven.

Second, the California Court of Appeal did not reach an unreasonable determination of the facts in light of the state court record. To challenge the Court of Appeal's assertion that Mr. Du Bois was caught off-guard by petitioner's testimony, petitioner cites to transcripts from September 13 2011 and September 16, 2011. Dkt. No. 153-2 at 23-28, 65-78. On those dates, petitioner

discussed the Four Seasons in court with Mr. Du Bois present.

While these submissions weaken respondent's position that Mr. Du Bois had no reason to know about the Four Seasons alibi, it does not render the Court of Appeal's factual conclusion unreasonable.  Based on the trial record and context as a whole, the Court of Appeals was not unreasonable in concluding that Mr. Du Bois could have been caught off guard by petitioner's decision to emphasize these facts one year later, during trial.  Consider the trial court's remarks on October 23, 2012, following Mr. Du Bois statement that he felt as if he "let [petitioner] down" for not pursuing a more rigorous investigation before trial:

> **The Court**: Mr. Dubois, your client was under oath to the extent he brought up the Four Seasons ever. He was under oath. To somehow feel or state that you did not anticipate the Prosecutor's willingness to pump that out, make it clear and make it bigger because he made a passing reference to it a year ago, and therefore you couldn't warn him that was a lie, don't bring that lie up. It's not anything close to my definition of incompetence of counsel. He says that under oath. He volunteered it.
>
> He emphasized endlessly the Cheese Cake Factory. If they instead pulled out something out that could establish that maybe he wasn't at the Cheese Cake Factory that night, when he received the judge (sic) in this, uh, a block away from the crime scene, saying the Cheese Cake Factory, it still wouldn't be your fault. He is the one who wanted to emphasize that as part of his defense to one of the two incidents. His other explanation to that and the similar seems to have been *Somebody is framing me or they're just all mistaken, I don't know which*. You are right. That's not a coherent defense, *The world is against me, they're making it up and they're doing it with DNA*. I mean, the reality is on one of these crimes they have DNA and the co-defendant saying he did it. On the other crime they have a derogation of I.D.s and his picture which he insists is not his picture.
>
> Are you going to believe your eyes or are you going to believe him? And the co-defendant's on the other one's, statements about jacket that the co-defendant was wearing and a third one what he was wearing, that appears to be worn by the robber, these are huge and strong things. He is always demanding, *You do more to prove that the evidence isn't the evidence*. There are limits to that.
>
> We should not overlook these enormous and strong pieces of evidence because he keeps insisting, even in outbursts in front of the jury, teary-eyed, how this isn't fair. What's not fair is an attitude so self-centered that he thinks the world should revolve around him. It is probably not what I should do in a Marsden, but the idea that you are going to whip yourself because you didn't pick up a throw-away line in one of the testimonies about a motion, when there are hundreds, perhaps now thousands, of motions where often he is under oath saying this or saying that and it has come back to bite him, no, I don't think that really reflects on you at all, other than the difficulty in anticipating what he might do and say when he is on the stand.

Dkt. No. 141-76 at 13-15 (emphasis in original). The Court of Appeals decision incorporated this broader context when finding that "the record reflects an attorney who struggled doggedly to overcome the obstacles created by an erratic and uncooperative client, providing defendant with an appropriate and professional defense. … [C]ounsel could hardly be faulted for not anticipating defendant's invention [that he was at the Four Seasons hotel]." Dkt. No. 141-81 at 16.  Accordingly, the Court cannot conclude that the California Court of Appeal's denial of this *Strickland* claim was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

### c. Irreconcilable Conflict.

The Court detailed petitioner's experiences in obtaining mental health treatment in Claim 2, *supra* Section A.1.  Here, petitioner asserts that he was denied his right to counsel because the state's failure to provide him Seroquel rendered him unable to assist counsel, thereby leading to an "irreconcilable conflict."  The California Supreme Court, which summarily denied the claim, could have reasonably concluded that petitioner's claim lacked legal merit.  Petitioner fails to cite to any U.S. Supreme Court caselaw indicating a violation of the right to counsel may be predicated on the defendant's own mental health struggles or the state's alleged failure to provide a defendant with defendant's preferred medication. Thus, fairminded jurists could find that the summary denial was consistent with Supreme Court precedent.

### d. Remaining Claims of Ineffective Assistance

The Second Amended Petition also sought to incorporate by reference nine other instances of allegedly ineffective assistance of counsel: (1) failure to investigate petitioner's medical history,

United States District Court
Northern District of California

Dkt. Nos. 45 at 19, 156 at 45; (2) failure to investigate or attack DNA evidence, Dkt. No. 45 at 18;[5] (3) asking petitioner an improper question on direct examination, *Id*. at 17; (4) requesting a mistrial before formally entering a stipulation on incompetency into the record, *Id*. at 20;[6] (5) failure to obtain transcripts to establish that a "critical document" had been filed with the court, *Id*. at 23; (6) failure to adequately prepare for or file various motions, *Id*. at 20-21; (7) failure to address alleged *Brady* violations arising from the prosecution's failure to disclose audio recordings, *Id*. at 22; (8) failure to advocate for an independent competency evaluation, *Id*. at 22; and (9) failure to provide certain documents to the doctors tasked with evaluating petitioner's insanity plea, *id*. at 19-20.

This Court has not specifically held that these additional instances of alleged ineffectiveness were properly exhausted. However, even assuming exhaustion was proper, the Court cannot conclude that any of the nine claims survive the "doubly deferential" review AEDPA imposes *Strickland* claims. *Knowles*, 556 U.S at 123. Accordingly, the Court declines to grant the petition on the remaining claims.

## I. Sixth Amendment Claim Based on Ineffective Assistance of Appellate Counsel (Claim 23)

Petitioner's Claim 23 asserts that he received ineffective assistance of appellate counsel on direct review of his criminal convictions. Based on the record below, the Court concludes petitioner has not established that the arguments or theories that could have supported the California Supreme Court's summary denial of petitioner's claim are inconsistent with Supreme Court precedent.

---

[5] The Court addresses the DNA issue in Claim 12, *supra*, Section F.3.

[6] The Court addresses this issue in Claim 7, *supra*, Section B.

### 1. Background to Petitioner's Claim

The Court must first determine the proper scope of Claim 23, which, as presented in the Second Amended Petition, asserts that appellate counsel was ineffective for raising weaker claims instead of Claims 1-19 and 21-23.

### a. Petitioner's Amended Petition and Request for Reconsideration

As initially presented in the Amended Petition filed in May 2017, Claim 23 asserted that appellate counsel (1) "failed to obtain and review the record that must be maintained under Cal. Rules of Court 8.320 for appellate cases[,]" (2) failed to address or take action on "evidence of trial counsel's false assertions to the court regarding his medical records[,]" and (3) failed to address or take action on "evidence contradicting rebuttal witness Tracy Wiese's false testimony."  Dkt. No. 45 at 23-24; Dkt. No. 43.

In January 2019, this Court held that petitioner "did not exhaust Claim 23" as presented in the Amended Petition.  Dkt. No. 79 at 23.  New counsel was subsequently appointed for petitioner, and he filed a Second Amended Petition along with a Motion for Reconsideration asking this court to reconsider, among other things, its determination that Claim 23 was not exhausted.  The Motion for Reconsideration argued that "the amended petition misstated Claim 23, omitting the central basis for appellate counsel IAC: appellate counsel's pursuit of meritless claims, ignoring stronger claims." Dkt. No. 120 at 19 (motion for leave to file reconsideration motion).  *See also* Dkt. No. 123 at 4-5 (petitioner's motion for leave to file second amended petition).

Based on these alleged oversights by prior counsel, the Second Amended Petition thus presented Claim 23 as an allegation that "appellate counsel pursued meritless claims and arguments and ignored (or failed to competently raise) Petitioner's stronger Claims 1-19 and 21-22." Dkt. No. 115 at 14.  To persuade the Court to reconsider its prior exhaustion order and permit this revamped Claim 23 to go forward, petitioner offered two new petitions to establish exhaustion: S253692

("Petition #14") and S252938 ("Petition #15"). Dkt. No. 120 at 20-21. In deciding the Motion for Reconsideration, the Court concluded that it could not consider Petition #14. Dkt. No. 130 at 13.

That left Petition #15. In that *pro se* petition—petition for a writ of habeas corpus filed with the California Supreme Court—petitioner wrote:

> Trial counsel failed to advise petitioner he would have been able to still present his federal constitutional speedy trial claim (and other constitutional claims rendering state unable to prosecute him) on direct appeal based on established U.S. Supreme Ct cases…Trial counsel warned petitioner if he took deal that he forfeits his speedy trial et al claims…
>
> Appellate counsel failed to raise this crucial assignment of error on appeal and instead raised "weaker claims."

Dkt. No. 117-13 at 6 (Petition #15). Petitioner's Motion for Reconsideration summarized Petition #15 as "fairly present[ing] *one additional ground* for appellate counsel IAC: failure to raise trial counsel IAC for erroneously advising him during plea negotiations that he would need to waive his right to appeal all claims if he accepted the plea offer of 22 years." Dkt. No. 120 at 21 (emphasis added). In opposing reconsideration, respondent argued:

> Petitioner contends that newly obtained [Petition #15] exhausted a new claim of appellate ineffective assistance, based on a new claim of trial ineffective assistance: that appellate counsel was ineffective for failing to raise a claim that trial counsel was ineffective for misadvising petitioner that he would have to waive his right to appeal all claims if he accepted a plea offer of twenty-two years. Doc. 120 at 17, 21; see Doc. 117-13 at 6. As discussed *supra*, petitioner's new sub-claim of ineffective assistance of trial counsel is unauthorized and not an appropriate subject for reconsideration as, inter alia, it could have been raised before. So too is the new claim of ineffective assistance of appellate counsel. The appellate ineffective assistance sub-claim, like the underlying trial ineffective assistance sub-claim, should be dismissed. *Should this Court permit the addition of these new claims, and permit "reconsideration" of them, then respondent would acknowledge the claim was fairly presented in [Petition #15].*

Dkt. No. 122 at 25 (emphasis added).

Accordingly, this Court's order granting the motion for reconsideration held: "respondent conceded that, if considered, Petition #15 would exhaust the claim. The Court will consider Petition #15 and agrees with respondent's concession. Therefore, Claim 23 is exhausted and may be heard by this Court." Dkt. No. 130 at 13.

United States District Court
Northern District of California

### b. Proper Scope of Exhaustion for Claim 23

Respondent now asserts that "all but one of petitioner's subclaims of ineffective assistance of appellate counsel are unexhausted." Dkt. No. 144-4 at 118 (underline filed under seal). Referring to its earlier concession, respondent remarks: "With respect, respondent conceded only that [Petition #15] had raised and exhausted a claim that appellate counsel was ineffective for failing to raise a claim that trial counsel was ineffective for failing to properly advise petitioner on the plea offer." *Id.* at 119.

Having reviewed Petition #15, the Court accepts respondent's clarification and concludes that its prior exhaustion order overstated Petition #15's effect on Claim 23. Petition #15 raises only a single theory of deficient performance of appellate counsel: failure to argue that trial counsel's plea deal constituted deficient performance, and instead arguing "weaker claims" on appeal. This single theory cannot exhaust the broader theory now articulated in Claim 23, namely, that appellate counsel "pursued meritless claims and ignored (or failed to competently raise) Petitioner's stronger claims (Claims 1-19 and 21-22)." Dkt. No. 115-1 at 21.

As presented in Petition #15, the California Supreme Court was asked to determine whether appellate counsel was ineffective for not raising trial counsel's plea deal advice, and instead arguing these four claims: (1) petitioner was incompetent to stand trial, (2) the trial court wrongfully denied petitioner's request for self-representation, (3) the trial court wrongfully denied petitioner's *Marsden* motions, and (4) petitioner was denied effective assistance of trial counsel. Dkt. No. 117-54, Ex. 54 (appellant's opening brief in state court). Petition #15 did not ask the California Supreme Court to compare these four issues against each of Claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 21, and 22, as petitioner now argues in Claim 23.

While a habeas "petitioner may provide further facts to support a claim in federal district court," those facts may not "fundamentally alter the legal claim already considered by the state courts." *Lopez v. Schriro*, 491 F.3d 1029, 1040 (9th Cir. 2007) (quoting *Vasquez v. Hillery*, 474

U.S. 254, 260 (1986)).  "[T]his rule allows a petitioner who presented a particular [ineffective assistance of counsel] claim, for example that counsel was ineffective in presenting humanizing testimony at sentencing, to develop additional facts supporting that particular claim."  *Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005).  If this Court were to permit wholesale review of Claim 23 as presented in the Second Amended Petition, this Court would be answering a different question than that posed to the California Supreme Court in Petition #15.

Accordingly, this Court *sua sponte* modifies its exhaustion order at Dkt. No. 130 to specify that Claim 23 is exhausted only to the extent of the legal claim raised in Petition #15: that appellate counsel was ineffective for not raising trial counsel's plea deal advice, and instead raising the four "weaker" claims.

### 2. Legal Standard

To prevail on an ineffective assistance of appellate counsel claim, a petitioner must satisfy both prongs set forth in *Strickland*.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  First, a petitioner must demonstrate that appellate counsel's performance was objectively unreasonable.  *Strickland*, 466 U.S. at 688. *See, e.g., Broyles v. Lewi*s, 66 F.3d 334, at *3 (9th Cir. 1995) (holding performance ineffective due to appellate counsel's "various errors and omissions, combined with his wholesale failure to investigate key portions of the trial court record and his unfounded assumptions about habeas corpus law").  Second, a petitioner must show that he would have prevailed on his appeal but for the allegedly deficient performance.  *Strickland*, 466 U.S. at 694.  *See Broyles*, 66 F.3d at *4 ("absent counsel's errors and omissions, there is a 'reasonable probability' that the outcome of [petitioner's] appeal would have been different.").

When asserting counsel was objectively unreasonable for failing "to raise a particular claim" on appeal, a petitioner must demonstrate that "a particular nonfrivolous issue was clearly stronger than issues that counsel did present."  *Smith*, 528 U.S. at 288 (holding "appellate counsel who files

a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."). *Cf. Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir.1987) (holding performance ineffective where appellate counsel "raised only a single, weak issue, notwithstanding the fact that a substantial, meritorious Fifth Amendment issue was obvious upon even a casual reading of the trial transcript").

Accordingly, when evaluating appellate counsel's decision to prioritize some claims over others, a court conducting habeas review must consult the trial record and consider "the potential strategic choices" counsel could have made to determine whether "counsel's conduct falls within the wide range of reasonable professional assistance." *Paul v. Pennywell*, 612 F. App'x 453 (9th Cir. 2015); *Gray v. Greer*, 800 F.2d 644, 646-47 (7th Cir. 1986) ("[T]he right to effective assistance of appellate counsel does not require an attorney to advance every conceivable argument on appeal which the trial record supports.").

Because the California Supreme Court summarily rejected petitioner's ineffective assistance of appellate counsel claim raised in Petition #15, the Court must consider what "arguments or theories" could have supported the California Supreme Court's decision. *Harrington*, 562 U.S. at 102. The Court must then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent" with the Supreme Court caselaw detailed above. *Id.* If fairminded jurists could find that appellate counsel's performance fell within the "range" of *Strickland's* "reasonable applications," relief is unwarranted. *Id*. at 105.

### 3. Discussion

Based on a careful review of the record, this Court concludes that the California Supreme Court could have determined that appellate counsel's decision to not raise the ineffective assistance of trial counsel claim based on the plea deal advice, but to instead raise four issues she did raise, was a tactical decision consistent with the range of *Strickland's* "reasonable applications." Further,

the Court concludes fairminded jurists could agree with such a result.  *Harrington*, 562 U.S. at 102.

Affording proper deference to the state court, this Court evaluates appellate counsel's decision to raise those claims she *did* raise against the claim petitioner states she *should* have raised. The first claim raised on direct appeal was that petitioner was tried while incompetent.  To support the contention, appellate counsel cited to transcripts that pre-dated the actual trial to argue that petitioner was not rational or lucid in the run-up to trial.  Dkt. No. 117-54 at 23-37.  Petitioner argues, however, that such a claim was meritless on appeal because the "record only supports that [petitioner] was incompetent while denied medication.  He was tried (the second time), well *after* his medication had resumed."  Dkt. No. 120 at 28.  Thus, petitioner argues, appellate counsel's first claim was contradicted by the record, because he was clearly competent by the time trial arrived.

The Court disagrees.  The California Supreme Court could have read the record to suggest that petitioner's competency was not perfectly tied to the administration of medication, rendering appellate counsel's argument meritorious.  *See* Dkt. No. 141-26 at 12 (in 2007, a psychiatrist found petitioner "acutely psychotic" while *both on and off* his medication); Dkt. No. 141-71 at 263-265 (on November 30, 2012, trial court observing that petitioner continued to exhibit "extreme outbursts" and "disruptions" that "continued…even when he now says he's on his meds").  Appellate counsel could have concluded, given petitioner's instability, that the trial court erred in trying petitioner even after medication had been consistently administered.  The California Supreme Court could have accorded tactical deference to such a decision, and fairminded jurists could agree that such a decision is consistent with *Strickland's* performance prong.

So too, with appellate counsel's second claim—that the trial court violated petitioner's right to self-representation in the months leading up to trial. Petitioner argues that this claim "lacks merit *and* contradicts" the first claim.  Dkt. No. 120 at 29 (emphasis in original).  The Court disagrees.  Appellate counsel's second claim is based on an argument that, if the trial court was right in finding petitioner competent to stand trial, then the trial was wrong in finding him incompetent for self-

representation at the same time.   Appellate counsel was simply raising an argument in the alternative.

The California Supreme Court could have concluded that, while some evidence indicated petitioner was not competent to represent himself in 2011, *see*, *e.g.*, Dkt. No. 141-12 at 10 (Mr. Du Bois declaring, in June 2011, that petitioner "is not able in his current mental state to assist in the rational presentation of his defense."), there was also evidence that the trial court was not convinced that petitioner actually lacked the competency needed to represent himself, and yet, denied petitioner's request for self-representation anyway. *See, e.g.*, Dkt. No. 141-42 at 14 (court observing petitioner in August 2011 and noting his conduct "suggests, he's really pretty competent. Now, there may be other mental issues having nothing to with the understanding and intelligence that can still effect that, but that sure goes a long way to establish pretty clearly competency under the law."). Thus, the California Supreme Court could have concluded that appellate counsel's decision to raise the second claim was within the range of tactical leeway permitted by *Strickland*, and fairminded jurists could agree that such a decision is consistent with the U.S. Supreme Court's pronouncements.

As to appellate counsel's final two claims—the denial of petitioner's *Marsden* motion and trial counsel's ineffective assistance—petitioner concedes that the claims are "colorable" but were "framed to lose." Dkt. No. 120 at 29.  The Court does not find petitioner's argument on either claim persuasive. The California Supreme Court could have concluded, first, that incorporating facts by reference does not entail objectively unreasonable performance, and second, appellate counsel's argument that an element of a claim should have been presumed does not entail objectively unreasonable performance merely because the appellate court rejected the argument.

As to the claim that appellate counsel *did not* raise—that trial counsel was ineffective for his advice on the appeal waiver in the plea deal—the California Supreme Court could have concluded that this claim was, at best, on par with those that were raised, and therefore, it was not objectively unreasonable for appellate counsel to not raise it.  *See Smith*, 528 U.S. at 288 (issue that was not

raised must be "clearly stronger than issues that counsel did present" to establish a *Strickland* claim).

As the Court discussed above in Claim 22, *supra* Section H.3.a, appellate counsel could have concluded that Mr. Du Bois' advice was not objectively unreasonable, because, as least in regard to the speedy trial claim, his advice was legally accurate.  Alternatively, appellate counsel could have concluded that an appeals court was unlikely to find any error here prejudicial because petitioner's acceptance of a plea deal appeared contingent on retaining this right to appeal a speedy trial claim, regardless of whether he could still appeal other claims.  *See*, Claim 22, *supra* Section H.3.a.  The California Supreme Court could have reached the same conclusions when evaluating the potential tactical decisions made by appellate counsel, and fairminded jurists could agree that deciding not to pursue such a claim on appeal was consistent with *Strickland* and the counsel's discretion to not "raise every 'colorable' claim suggested by a client."  *Jones v. Barnes*, 463 U.S. 745, 754 (1983).

## CONCLUSION

Having considered the trial court record and affording proper deference under 28 U.S.C § 2254(d), the Court concludes that petitioner is not entitled to habeas relief on any of the claims asserted in the petition, namely, Claims 2, 7, 8, 12, 14, 18, 21, 22, 23.  The petition for writ of habeas corpus is **DENIED**.

**IT IS SO ORDERED**.

Dated: March 29, 2022

SUSAN ILLSTON
United States District Judge